# U.S. District Court
## U.S. District of Minnesota (DMN)
## CIVIL DOCKET FOR CASE #: 0:25–cv–01976–KMM–JFD
### *Internal Use Only*

| | |
|---|---|
| Harsono v. Trump et al | Date Filed: 05/02/2025 |
| Assigned to: Judge Katherine M. Menendez | Jury Demand: None |
| Referred to: Magistrate Judge John F. Docherty | Nature of Suit: 463 Habeas Corpus – Alien |
| Cause: 28:2241 Petition for Writ of Habeas Corpus (federa | Detainee |
| | Jurisdiction: U.S. Government Defendant |

**Petitioner**

**Aditya Wahyu Harsono**                   represented by   **Benjamin Casper**
American Civil Liberties Union of
Minnesota
P.O. Box 14720
55057
Minneapolis, MN 55414
651–271–6661
Email: bcasper@aclu–mn.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kshithij Shrinath**
Greene Espel PLLP
222 S 9th Street
Ste Unit 2200
Minneapolis, MN 55402
612–373–8338
Email: kshrinath@greeneespel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linus Chan**
Univeristy Of Minnesota
Detainee RIghts Clinic
229 19th Ave South
University of Minnesota Law School
Room 190
Minneapolis, MN 55455
612–301–1156
Email: rlchan@umn.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Gad**
Gad & Gad Law Offices
Minneapolis
8 E 25th St

Minneapolis, MN 55404
630−779−6934
Email: sarah@gadlawoffice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Teresa J Nelson**
ACLU of Minnesota
P.O. Box 14720
Minneapolis, MN 55414
651−529−1692
Email: tnelson@aclu−mn.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Donald J. Trump**
*in his official capacity as President of the*
*United States*

represented by **Ana H Voss**
United States Attorney's Office
300 S 4th St Ste 600
Minneapolis, MN 55415
612−664−5600
Fax: 612−664−5788
Email: ana.voss@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**Pamela Bondi**
*in her official capaacity as United States*

represented by **Ana H Voss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**Daniel Hartog**
*in his official capacity as the Kandiyohi*
*County Sheriff*

**Respondent**

**Matthew Akerson**
*in his official capacity as Kandiyohi*
*County Jail Administrator*

**Respondent**

**Peter Berg**
*in his official capacity as the St. Paul*
*Field Office Director for U.S.*
*Immigration and Customs Enforcement*

represented by **Ana H Voss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**Jamie Holt**
*in her official capacity as Homeland
Security Investigations St. Paul Special
Agent in Charge, U.S. Immigration and
Customs Enforcement*

represented by **Ana H Voss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**Todd Lyons**
*in his official capacity as Acting Director,
U.S. Immigration and Customs
Enforcement*

represented by **Ana H Voss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**Kristi Noem**
*in her official capacity as Secretary of the
United States Department of Homeland
Security*

represented by **Ana H Voss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**Marco Rubio**
*in his official capacity as Secretary of
State*

represented by **Ana H Voss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 05/02/2025 | 1 | PETITION for Writ of Habeas Corpus (filing fee $ 5, receipt number AMNDC−11867658) filed by Aditya Wahyu Harsono. No summons requested. (Attachments: # 1 Civil Cover Sheet) (Shrinath, Kshithij) Modified text on 5/5/2025 (ABR). (Entered: 05/02/2025) |
| 05/02/2025 | 2 | Ex Parte MOTION for Temporary Restraining Order – Expedited Handling Requested, Ex Parte MOTION for Preliminary Injunction – Expedited Handling Requested filed by Aditya W. Harsono. (Shrinath, Kshithij) (Entered: 05/02/2025) |
| 05/02/2025 | 3 | NOTICE OF HEARING ON MOTION 2 Ex Parte MOTION for Temporary Restraining Order – Expedited Handling RequestedEx Parte MOTION for Preliminary Injunction – Expedited Handling Requested : Date and time to be determined. (Shrinath, Kshithij) (Entered: 05/02/2025) |
| 05/02/2025 | 4 | MEMORANDUM in Support re 2 Ex Parte MOTION for Temporary Restraining Order – Expedited Handling RequestedEx Parte MOTION for Preliminary Injunction – Expedited Handling Requested filed by Aditya W. Harsono. (Attachments: # 1 LR7.1/LR72.2 Word Count Compliance Certificate)(Shrinath, Kshithij) (Entered: 05/02/2025) |
| 05/02/2025 | 5 | Declaration of Aditya Wahyu Harsono in Support of 2 Ex Parte MOTION for |

| | | |
|---|---|---|
| | | Temporary Restraining Order – *Expedited Handling Requested*Ex Parte MOTION for Preliminary Injunction – *Expedited Handling Requested* filed by Aditya W. Harsono. (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2)(Shrinath, Kshithij) (Entered: 05/02/2025) |
| 05/02/2025 | 6 | Declaration of Kerry Doyle in Support of 2 Ex Parte MOTION for Temporary Restraining Order – *Expedited Handling Requested*Ex Parte MOTION for Preliminary Injunction – *Expedited Handling Requested* filed by Aditya W. Harsono.(Shrinath, Kshithij) (Entered: 05/02/2025) |
| 05/02/2025 | 7 | Declaration of Sarah Gad in Support of 2 Ex Parte MOTION for Temporary Restraining Order – *Expedited Handling Requested*Ex Parte MOTION for Preliminary Injunction – *Expedited Handling Requested* filed by Aditya W. Harsono. (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2, # 3 Exhibit(s) 3, # 4 Exhibit(s) 4, # 5 Exhibit(s) 5, # 6 Exhibit(s) 6, # 7 Exhibit(s) 7, # 8 Exhibit(s) 8, # 9 Exhibit(s) 9, # 10 Exhibit(s) 10, # 11 Exhibit(s) 11, # 12 Exhibit(s) 12, # 13 Exhibit(s) 13, # 14 Exhibit(s) 14, # 15 Exhibit(s) 15)(Shrinath, Kshithij) (Entered: 05/02/2025) |
| 05/02/2025 | 8 | PROPOSED ORDER TO JUDGE re 2 Ex Parte MOTION for Temporary Restraining Order – *Expedited Handling Requested*Ex Parte MOTION for Preliminary Injunction – *Expedited Handling Requested* filed by Aditya W. Harsono.(Shrinath, Kshithij) (Entered: 05/02/2025) |
| 05/02/2025 | 9 | PROPOSED ORDER TO JUDGE re 2 Ex Parte MOTION for Temporary Restraining Order – *Expedited Handling Requested*Ex Parte MOTION for Preliminary Injunction – *Expedited Handling Requested* filed by Aditya W. Harsono.(Shrinath, Kshithij) (Entered: 05/02/2025) |
| 05/05/2025 | 10 | (Text–Only) CLERK'S NOTICE OF INITIAL CASE ASSIGNMENT. Case assigned to Judge Katherine M. Menendez per Civil (3rd, 4th – Prisoner) list, referred to Magistrate Judge John F. Docherty. Please use case number 25–cv–1976 (KMM/JFD).<br><br>**Notice: All Nongovernmental Corporate Parties must file a Rule 7.1 Corporate Disclosure Statement.**<br><br>(ABR) (Entered: 05/05/2025) |
| 05/05/2025 | 11 | ORDER.Signed by Judge Katherine M. Menendez on 5/5/2025.(SDV) (Entered: 05/05/2025) |
| 05/06/2025 | | *** Set/Reset Hearings: Status Conference set for 5/6/2025 at 02:30 PM in Telephone Conference (no courtroom) before Judge Katherine M. Menendez. (ACH) (Entered: 05/06/2025) |
| 05/06/2025 | 13 | NOTICE by Aditya Wahyu Harsono re 1 Petition for Writ of Habeas Corpus, (Attachments: # 1 Order (ECF 29, Case No. 25–cv–1576))(Shrinath, Kshithij) (Entered: 05/06/2025) |
| 05/06/2025 | 14 | (Text–Only) **MINUTE ENTRY for proceedings held before Judge Katherine M. Menendez on 5/6/2025: Status Conference.**<br><br>Court Reporter: Paula Richter<br>Minneapolis Courthouse, Courtroom Telephone Conference<br>Time: 2:33 p.m. – 2:52 p.m.<br>Total Time: 19 Minutes |

| | | |
|---|---|---|
| | | **APPEARANCES:**<br>**For Plaintiff(s):** Kshithij Shrinath; Benjamin Casper; Linus Chan; Sarah Gad<br>**For Defendant(s):** Ana H. Voss<br><br>**PROCEEDINGS:**<br>Discussion regarding case status.<br>(Text–only) BRIEFING ORDER: Based on the parties' agreement, the Court enters the following briefing schedule: (1) The deadline for Respondents to file their Response to the Habeas Petition is Thursday, 5/8/2025; and (2) the deadline for Petitioner's Reply in Support of the Petition is Monday, 5/12/2025. Signed by United States District Judge Katherine M. Menendez on 5/6/2025. (Entered: 05/06/2025) |
| 05/08/2025 | 15 | RESPONSE re 1 Petition for Writ of Habeas Corpus, .(Voss, Ana) (Entered: 05/08/2025) |
| 05/08/2025 | 16 | DECLARATION of William J. Robinson by Matthew Akerson, Peter Berg, Pamela Bondi, Daniel Hartog, Jamie Holt, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump . (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2, # 3 Exhibit(s) 3, # 4 Exhibit(s) 4)(Voss, Ana) (Entered: 05/08/2025) |
| 05/08/2025 | 17 | DECLARATION of John Armstrong by Matthew Akerson, Peter Berg, Pamela Bondi, Daniel Hartog, Jamie Holt, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump . (Attachments: # 1 Exhibit(s) 1)(Voss, Ana) (Entered: 05/08/2025) |
| 05/12/2025 | 18 | REPLY re 15 Response, 1 PETITION for Writ of Habeas Corpus – Expedited Handling RequestedEx Parte MOTION for Preliminary Injunction – Expedited Handling Requested filed by Aditya Wahyu Harsono. (Attachments: # 1 LR7.1/LR72.2 Word Count Compliance Certificate)(Shrinath, Kshithij) Modified text on 5/13/2025 (LTT). (Entered: 05/12/2025) |
| 05/12/2025 | 19 | Second Declaration of Sarah Gad in Support of 18 REPLY re 15 Response filed by Aditya Wahyu Harsono. (Attachments: # 1 Exhibit(s) 16, # 2 Exhibit(s) 17, # 3 Exhibit(s) 18, # 4 Exhibit(s) 19)(Shrinath, Kshithij) Modified text on 5/13/2025 (MMP). (Entered: 05/12/2025) |
| 05/12/2025 | 20 | Declaration of Adam Thompson in Support of 18 Petitioner's Reply filed by Aditya Wahyu Harsono.(Shrinath, Kshithij) Modified text on 5/13/2025 (MMP). (Entered: 05/12/2025) |
| 05/14/2025 | 21 | ORDER Directing Clerk to Enter Judgment. The motion for preliminary injunctive relief 2 is denied as moot. The Petition 1 is granted in part. Petitioner shall be released from custody, immediately, subject to the conditions previously imposed by the Immigration Judge, including the $5,000 bond. Within 48 hours of this Order, Respondents shall notify the Court of the date and time of Petitioner's release. Signed by Judge Katherine M. Menendez on 5/14/2025. (Entered: 05/14/2025) |
| 05/15/2025 | 22 | JUDGMENT (Attachments: # 1 Civil Notice – appeal)(ACH) (Entered: 05/15/2025) |
| 05/16/2025 | 23 | Second DECLARATION of William Robinson by Matthew Akerson, Peter Berg, Pamela Bondi, Daniel Hartog, Jamie Holt, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump . (Voss, Ana) (Entered: 05/16/2025) |
| 07/11/2025 | 24 | |

| | | |
|---|---|---|
| | | NOTICE OF APPEAL TO 8TH CIRCUIT as to 21 Order Directing Clerk to Enter Judgment, 22 Judgment by Matthew Akerson, Peter Berg, Pamela Bondi, Jamie Holt, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump. (Voss, Ana) (Entered: 07/11/2025) |
| 07/14/2025 | 25 | TRANSMITTAL OF APPEAL LETTER TO U. S. COURT OF APPEALS, 8TH CIRCUIT, Re: Notice of Appeal to 8th Circuit 24 . (LTT) (Entered: 07/14/2025) |

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Aditya W. H.,

      Petitioner

v.

DONALD J. TRUMP, in his official
capacity as President of the United States;
PAMELA BONDI, in her official capacity
as United States; DANIEL HARTOG, in
his official capacity as the Kandiyohi
County Sheriff; MATTHEW AKERSON,
in his official capacity as Kandiyohi
County Jail Administrator; PETER BERG,
in his official capacity as the St. Paul Field
Office Director for U.S. Immigration and
Customs Enforcement; JAMIE HOLT, in
her official capacity as Homeland Security
Investigations St. Paul Special Agent in
Charge, U.S. Immigration and Customs
Enforcement; TODD LYONS, in his
official capacity as Acting Director, U.S.
Immigration and Customs Enforcement;
KRISTI NOEM, in her official capacity as
Secretary of the United States Department
of Homeland Security; and MARCO
RUBIO, in his official capacity as
Secretary of State;

      Respondents.

No. 25-cv-1976 (KMM/JFD)

**ORDER**

---

      Petitioner Aditya W. H. (hereafter "Petitioner" or "Mr. H") brought this action

seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2241. Pet., ECF No. 1. In his

Petition, Mr. H requests an Order enjoining Respondents from transferring Mr. H outside

the jurisdiction of this District while these proceedings are pending; directing

1

Respondents to immediately release Mr. H from immigration custody; awarding Mr. H his reasonable attorney's fees; and any other appropriate relief. Pet., Prayer for Relief ¶¶ 1–5. For the reasons that follow, the Petition is granted in part and Respondents are ordered to immediately release Mr. H on appropriate conditions.

## BACKGROUND

### *Petitioner's Background*

Mr. H is a 34-year-old Muslim student from Indonesia. He is an artist and a musician and has been a vocal advocate for social justice. Pet'r's Decl. ¶¶ 14–23, ECF No. 5; *id.*, Exs. 1–2; Pet. ¶ 1; *see also* Robinson Decl. ¶ 4, ECF No. 16. Mr. H entered the United States in January 2015 on an F-1 student visa and attended Southwest Minnesota State University in Marshall, Minnesota. Pet'r's Decl. ¶ 6; Robinson Decl. ¶ 4; Gad Decl., Ex. 3 at 3, ECF No. 7. He received his Bachelor of Science degree in Environmental Science from SMSU in 2017. Pet'r's Decl. ¶ 6. After graduation he was authorized to work in the United States through a program called Optional Practical Training ("OPT"). Pet'r's Decl. ¶ 7. In August 2021, Mr. H reapplied for an F-1 student visa to pursue a Master of Business Administration degree with a concentration in Supply Chain Management. That application was approved, and he had valid F-1 visa status that was set to last through June 2026. Pet'r's Decl. ¶ 8; Gad Decl., Ex. 6 at 3, 7.

Mr. H completed his MBA in December 2023 and began working at a hospital, the Avera Regional Medical Center, through a Curricular Practical Training program under his F-1 status. In that role, eventually he transitioned to OPT pursuant to his F-1 visa. Pet'r's Decl. ¶9; Gad Decl., Ex. 6 at 36, ECF No. 7. Those who know Mr. H through

school and work admire his contributions to his community in Marshall. Gad Decl., Ex. 6 at 62–66. Mr. H has a pending application for permanent resident status based on his October 2023 marriage to Mrs. H, a United States citizen. *See* Gad Decl. ¶ 5 & Ex. 1 (Notice of Receipt of Form I-485 Application); *id.*, Ex. 6 at 7 (Marriage Certificate); Pet'r's Decl. ¶¶ 12–13. The couple has a nine-month-old daughter with special needs. Pet'r's Decl. ¶ 40; Gad Decl., Ex. 6 at 11.

Mr. H does not have any significant criminal history. He has a small number of driving-related citations. In 2021, Mr. H was arrested during a peaceful protest following the police killings of George Floyd and Daunte Wright. That arrest resulted in a charge for presence at an unlawful assembly that was formally dismissed "in the interests of justice." Mr. H also has a conviction for a non-violent misdemeanor property-damage offense from 2022. Mr. H spray-painted graffiti art on the side of semi-trailers, and based on the asserted dollar value of the damage to those trailers, he was initially charged with first-degree property damage, a felony. Mr. H was not convicted of a felony, however. He entered a guilty plea to a fourth-degree misdemeanor charge, received a stayed sentence, completed a year of probation without incident, and has had no subsequent contact with the criminal justice system. *See* Pet'r's Decl. ¶¶ 15, 31; Gad Decl. ¶ 6, Ex. 3 at 4, Ex. 4 at 6–8; Pet. ¶ 59; Robinson Decl. ¶¶ 5–6. While the protest-related charge remained pending, the government approved Mr. H's application for his second F-1 visa to pursue his MBA. Pet'r's Decl. ¶¶ 8, 15.

Petitioner traveled to Indonesia in the spring of 2024, and he returned to the United States at the Los Angeles International Airport on April 27, 2024. Pet'r's Decl.

3

¶ 30; Gad Decl., Ex. 6 at 8. This was his most recent reentry into the United States. Robinson Decl. ¶ 4. At that time, Customs and Border Protection officials conducted security inspections and lawfully readmitted Mr. H to the United States. Pet'r's Decl. ¶ 30; Gad Decl., Ex. 5 at 7–8 (records of departure and arrival). That admission into the U.S. post-dated Mr. H's misdemeanor conviction, and Respondents were fully aware of Mr. H's criminal history at the time they readmitted him. *See* Pet. ¶¶ 60, 75, 81; Pet'r's Decl. ¶ 34.

During his time in the United States, Mr. H has been a vocal advocate for causes in which he believes and has created a company focused on selling environmentally friendly merchandise and sustainable products. Pet'r's Decl. ¶¶ 14–23. He explains: "[a]s a practicing Muslim, my faith teaches me to stand up for justice and the dignity of all people. Guided by those values, I actively participated in peaceful protests against police brutality, including in the wake of the tragic deaths of George Floyd and Daunte Wright in 2020 and 2021." Pet'r's Decl. ¶ 14. Mr. H sells products through a small clothing line called *Butter Soup & Frozen Custard*. Pet'r's Decl. ¶¶ 17–18. In the original Instagram account for his clothing line, he posted pictures that referenced political issues, including a Palestinian flag, and a mural that read "BLM" and "Free Palestine." Pet'r's Decl. ¶ 19; *id.*, Ex. 1. In the biography section of his new account for the clothing line, Mr. H includes the Arabic phrase "Free Palestine." Pet'r's Decl. ¶ 20. Mr. H states that he has donated to nonprofit organizations that provide humanitarian aid and conduct environmental restoration efforts. Pet'r's Decl. ¶ 21. He has "never supported any group

or organization that engages in political violence or terrorism, including Hamas or any other group." Pet'r's Decl. ¶ 22.

### *Respondents' Alleged Policies*

The Petition asserts that Respondents "developed and implemented a policy using the immigration system to retaliate against international students' protected speech and association." Pet. at 12 (Heading, § I.A.). Specifically, the Petition refers to Executive Order 14161 and Executive Order 14188, which were issued by Respondent, President Donald J. Trump, following his inauguration in January 2025. Executive Order 14161 provides that "the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security." Exec. Order No. 14161, 90 Fed. Reg. 8451, § 1(b) (Jan. 30, 2025); *see also* Pet. ¶ 30. Executive Order 14188 instructs the Secretary of State, Secretary of the Department of Education, and the Secretary of DHS to ensure that "institutions of higher education [are familiar] with the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3) so that such institutions may monitor and report activities by alien students and staff relevant to those grounds. . . ." Exec. Order 14188, 90 Fed. Reg. 8847, 8848 § 3(e) (Jan. 29, 2025); Pet. ¶ 31. It also instructs those officials to ensure that reports regarding those noncitizens "lead, . . . if warranted, [to] actions to remove such aliens." 90 Fed. Reg. at 8848 § 3(e).

Following these Executive Orders, the Petition alleges that "Respondents began implementing the broad and vague 'Foreign Policy Ground' for deportability, codified at

8 U.S.C. § 1227(a)(4)(C)(i)" which allows the Secretary of State to revoke visas when

"an individual's 'presence or activities' in the United States are deemed to have

'potentially serious adverse foreign policy consequences.'" Pet. ¶ 32. Petitioner alleges

that Respondents have applied the Foreign Policy Ground to punish constitutionally

protected speech of international students in the United States and have revoked the visas

of students engaged in political expression, particularly those advocating for Palestinian

rights or supporting racial justice. Pet. ¶¶ 38–39. Further, Petitioner alleges that ICE and

DHS have "used social media surveillance to target international students for

deportation" by using "artificial intelligence and data analytics to target international

students *both* for protected pro-Palestinian speech *and* for any kind of contact with the

criminal justice system." Pet. ¶ 42.

These allegations are consistent with an April 2025 DHS memo announcing that it

is screening social media activity for immigration purposes pursuant to Executive Orders

14161 and 14188.[1] Since 2019, the State Department has required visa applicants to

register identifying information for their social media accounts on an array of platforms.

Pet'r's Reply at 12–13 & nn.10–11, ECF No. 18. In addition, media reporting reveals that

the State Department has engaged in "social media vetting" for F-1 visa applicants. *Id.* at

13 n.13 (citing Ken Klippenstein, *Trump Admin Spies on Social Media of Student Visa

Holders*, Substack (Mar. 28, 2025), https://www.kenklippenstein.com/p/exclusive-trump-

admin-spies-on-social (citing 25 State 26168, *Action Request: Enhanced Screening and*

---

[1] U.S. Citizenship and Immigration Servs., *DHS to Begin Screening Aliens' Social Media Activity for Antisemitism* (Apr. 9, 2025), https://www.uscis.gov/newsroom/news-releases/dhs-to-begin-screening-aliens-social-media-activity-for-antisemitism.

*Social Media Vetting for Visa Applicants*). Mr. H asserts that these actions violate the targeted students' First Amendment rights to freedom of speech and Fifth Amendment due process rights.

In the weeks leading up to the filing of this Petition, Petitioner alleges that "DHS has notified hundreds, if not thousands, of international students that they have 'lost status' due to visa revocations or [Student and Exchange Visitor Information System ("SEVIS")] record terminations." Pet. ¶ 48. "As of April 28, 2025, over 240 colleges and universities have reported more than 1,800 international students and recent graduates who have been similarly affected." Pet. ¶ 48. Petitioner asserts that the visa revocations implemented by Respondents fail to conform to requirements imposed by federal statutes and regulations governing visa revocations and termination of SEVIS records. Pet. ¶¶ 49–51.

### *Petitioner's Arrest and Detention*

According to John Armstrong, an official within the State Department's Bureau of Consular Affairs, on Saturday, March 22, 2025, U.S. Department of Homeland Security U.S. Immigration and Customs Enforcement ("DHS" "ICE") contacted the Department of State seeking its determination as to whether Mr. H's F-1 student visa should be revoked, with immediate effect, under Section 221(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1201(i). Armstrong Decl. ¶ 4, ECF No. 17. Respondents have not provided the underlying March 22nd communication from DHS to the State Department in response to Mr. H's habeas petition. Nor have the Respondents offered any evidence about why they selected Mr. H for this action. On March 23, 2025, Armstrong

sent a State Department memo to Andre Watson (ICE Assistant Director, National Security Division), stating that the Bureau of Consular Affairs revoked Mr. H's F-1 visa under Section 221(i) "based on the underlying information and assessment provided by DHS ICE that [Mr. H] posed a threat to U.S. public safety." Armstrong Decl. ¶ 5; Gad Decl., Ex. 4 at 4 (3/23/25 DOS Mem.). The State Department informed ICE that Mr. H's visa was revoked "effective immediately." Armstrong Decl. ¶ 5; Gad Decl., Ex. 3 at 3. The March 23rd State Department memo also indicates that DHS/ICE informed the State Department, prior to the revocation of Mr. H's visa, that it "intends to immediately pursue removal of [Mr. H.]" 3/23/25 DOS Mem. Mr. Armstrong states that the revocation of Mr. H's visa "predated the filing of this lawsuit" but the State Department did not immediately notify Petitioner of the revocation "[a]t the request of interagency partners, and for operational security reasons. . . ." Armstrong Decl. ¶ 7. The March 23rd State Department memo characterizes the revocation of Petitioner's visa as "silent." Gad Decl., Ex. 3 at 3. Based on that "silence," Mr. H was not given immediate notice of the purported revocation of his student visa.

According to Mr. H's "A-File,"[2] on March 24, 2025, following the revocation of his visa, Homeland Security Investigations ("HSI"), an arm of ICE, "received an investigative lead as part of the Student Criminal Alien Initiative relating to [Mr. H]."

---

[2] "A-Files are used to document aliens' interactions with USCIS, Customs and Border Protection, and Immigration and Customs Enforcement. They include all an individual's official immigration and naturalization records and are identified by a unique A-Number." U.S. Citizenship and Immigration Servs., *A-File #1 (Million): The first A-File* (updated Jan. 24, 2025), https://www.uscis.gov/about-us/our-history/stories-from-the-archives/a-file-1-million-the-first-a-file.

Gad Decl., Ex. 3 at 3. The available information indicates that the "Student Criminal

Alien Initiative" is a DHS effort

> to run the names of the nearly 1.3 million nonimmigrant
> students studying in the United States through the National
> Crime Information Center (NCIC) database. … As part of this
> initiative . . ., DHS staff complied lists of students with arrest
> or other criminal records and sent batches of that information
> to the State Department, which resulted in visa revocations for
> over 3,000 students. … DHS terminated SEVIS records for
> those students.

*Vyas v. Noem*, No. 3:25-cv-00261, Doc. 30 at 7 (S.D. W. Va. May 8, 2025) (taking

judicial notice); *see also* Second Gad Decl., Ex. 19, *Patel v. Lyons*, No. 1:25-cv-01096-

ACR, Doc. 20-2 (D.D.C. May 2, 2025) (Hr'g Tr.), ECF No. 19. Andre Watson, the Senior

Official within the National Security Division for HSI stated that HSI's Counter Threat

Lead Development Unit is responsible for "analyzing information related to alien

nonimmigrant visa holders, who are lawfully admitted to the United States but violate the

terms of their admission, pose a threat to national security or public safety and/or are

involved in criminal activity for field referral and further investigation." Robinson Decl.,

Ex. 4 at 39–44, Watson Decl. ¶¶ 1, 5. In another case, Watson described how other

students' information was run against criminal databases and connected to law

enforcement records shortly before their SEVIS records were terminated. Watson Decl.

¶¶ 6–9, 11–12, 14–16, 18–20.

      On March 27, 2025, Mr. H was arrested by plainclothes ICE agents while he was

at his job at Avera Marshall hospital. Pet'r's Decl. ¶ 24; *see also* Gad Decl. ¶ 7. The ICE

agents instructed Mr. H's coworkers to stage a meeting with him in the basement of the

hospital and told them that failing to cooperate would have legal consequences. Pet.

¶¶ 67–68. When the coworkers complied and Mr. H went to the basement for the

purported meeting, ICE agents seized him, placed him in handcuffs, and transported him

in an unmarked vehicle to Kandiyohi County Jail. Pet'r's Decl. ¶ 24. The ICE agents did

not provide Mr. H with a warrant for his arrest, and Mr. H has not been charged with a

crime. Pet'r's Decl. ¶ 25. On March 27th, HSI issued an administrative arrest warrant,

which indicates that it was served on Mr. H on March 28th, the day after his arrest.

Robinson Decl. ¶ 8, Ex. 1.[3] Mr. H was also not informed of the reason he was being

arrested. Instead, ICE agents told him that "they will explain all that to you tomorrow"

without clarifying who "they" were. Pet'r's Decl. ¶ 25.

William J. Robinson, an ICE Deportation Officer, states that "[a]t the time of

[Mr. H's] arrest, the ICE officials who executed the warrant, arrested [Mr. H], and brough

[sic] the charges were not aware of any statements or pronouncements made by [Mr. H]

on social media through his personal accounts or his business accounts," Robinson Decl.

¶ 10, but none of these officials who were involved in the arrest is identified by name or

job title.[4] Mr. Robinson does not state how DHS or ICE originally became aware of

Mr. H's criminal history. Critically, missing from Mr. Robinson's declaration is any

---

[3] As reflected on the face of the warrant for Mr. H's arrest, an ICE administrative warrant is different from a judicial arrest warrant. The latter requires an independent judicial officer to determine that there is probable cause to believe that the person to be arrested has committed a crime. In the immigration context, the administrative arrest warrant (Form I-200) is issued based on an immigration officer's own determination of probable cause that a noncitizen is removable from the United States. *See Abel v. United States*, <u>362 U.S. 217, 233</u> (1960) (discussing history and use of administrative warrants in the immigration context and implicitly finding the use of such administrative warrants constitutional).

[4] Mr. Robinson provides no explanation regarding how he knows what the arresting officers knew, beyond the assertion that his declaration is based, in part, on "information conveyed to me by other law enforcement officials," Robinson Decl. ¶ 1.

attestation about what was known to the officials actually responsible for ordering Petitioner's arrest regarding Mr. H's speech on matters of public concern.

On March 28, 2025, ICE transferred Mr. H to the Fort Snelling ICE Field Office where he informed ICE officials that he had a valid F-1 status, was lawfully working under OPT, and had a pending I-485 application for adjustment of status based on his marriage. Pet'r's Decl. ¶ 28; Robinson Decl. ¶ 9. ICE officers told Mr. H that they could not verify what he was telling them because the SEVIS database was "down." Pet'r's Decl. ¶ 28. ICE agents served Mr. H with a Notice to Appear ("NTA") alleging that he was removable because he was admitted to the United States at an unknown place in April 2024 and remained in the United States after the March 23, 2025 revocation date of his F-1 visa. Pet'r's Decl. ¶ 29; Gad Decl. ¶ 8; Robinson Decl. ¶ 9. The NTA asserts that DHS charged Mr. H with being subject to removal under Section 237(a)(1)(B) of the INA, 8 U.S.C. § 1227(a)(1)(B),[5] for remaining in the U.S. after visa revocation. Gad Decl., Ex. 2.

The SEVIS website indicates that Mr. H's record was "terminated" and lists a "status change date" of March 29, 2025. Robinson Decl., Ex. 4 at 27. On March 29th, the site indicated that "Student is terminated pursuant to 237(a)(1)(C)(i) and 237(a)(4)(C)." Gad Decl., Ex. 5 at 7. As noted, INA 237(a)(4)(C) is the Foreign Policy Ground under

---

[5] INA § 237(a) provides for the removal of certain classes of noncitizens who have been admitted to the United States by immigration authorities. As relevant here, this includes any noncitizen "whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under [INA § 221(i), 8 U.S.C. § 1201(i).]" 8 U.S.C. § 1227(a)(1)(B). In turn, INA § 221(i) allows the Secretary of State to revoke a visa after it has been issued to a noncitizen and requires that notification of the revocation be provided to the Secretary of DHS. 8 U.S.C. § 1201(i).

which the Secretary of State may revoke visas when an individual's presence or activities in the United States are deemed to have potentially serious adverse foreign policy consequences. Despite this assertion, the Respondents now claim that "[t]he Secretary of State did not make any determination under Section 237(a)(4)(C) of the INA with respect to [Mr. H]." Armstrong Decl. ¶ 5. Mr. H's SEVIS record shows a "Manual Data Change" on April 8, 2025 at 12:06 a.m. performed by "SEVIS Maintenance." Gad Decl., Ex. 5 at 7. The SEVIS record shows that Petitioner was "identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." Gad Decl. Ex. 5 at 2. Respondents represent that the reference to the Foreign Policy Ground was removed as a "correction" to the SEVIS record to reflect that visa-revocation was the reason for the SEVIS termination. Resp't's Resp. 10, ECF No. 15.

On April 7, 2025, ICE provided three documents to Mr. H that it asserted supported his removal from the United States: (1) a memorandum from the United States Department of State purporting to document a "silent revocation" of Mr. H's visa based on his two-year-old misdemeanor conviction; (2) a dismissal order regarding his 2021 protest arrest, which showed that the charges had been dismissed "in the interests of justice"; and (3) a copy of his plea petition in the misdemeanor graffiti case. Pet'r's Decl. ¶ 31; Gad Decl., Ex. 4. On April 10, 2025, Mr. H appeared for a bond hearing before an immigration judge ("IJ"). Pet'r's Decl. ¶ 36. His counsel presented evidence at the hearing showing Mr. H's full compliance with probation, stable family and community ties, and eligibility for permanent residency based on his marriage to Mrs. H. Pet'r's Decl. ¶ 36; Gad Decl. ¶ 9. At the hearing, DHS presented the same evidence referenced

12

above and the previously served NTA. Gad Decl. ¶ 10. The IJ found that Mr. H posed

neither a danger nor a flight risk, and set a $5,000 bond. Pet'r's Decl. ¶ 37; Gad Decl.

¶ 11; Gad Decl., Ex. 7, IJ Bond Decision at 3–4.

However, DHS did not release Mr. H at that time. Instead, DHS appealed the

decision to the Board of Immigration Appeals and invoked an immigration regulation (8

C.F.R. § 1003.19(i)(2)) to block Mr. H's release through an automatic stay. Pet'r's Decl.

¶ 37; Gad Decl. ¶ 12; Gad Decl., Ex. 8. According to Kerry Doyle, an experienced

immigration attorney, the automatic stay provision is rarely invoked and only in

extraordinary circumstances. Doyle Decl. ¶¶ 7, 12–13, ECF No. 6. Subsequent efforts by

Mr. H's immigration counsel have been unsuccessful in obtaining his release from DHS

custody. Gad Decl. ¶¶ 13–17 & Exs. 5, 9, 10, 14, 15.

Petitioner alleges that Respondents have no lawful basis under the immigration

laws to detain him or to seek to remove him from the United States, and asserts that

Respondents have provided shifting and incoherent rationales for his detention. For

example, although ICE agents told Mr. H on March 28, 2025 that he was detained

because he had "no lawful status," SEVIS records confirmed that his F-1 status remained

active and in good standing at that time. Pet. ¶ 71. Although the NTA charged him as

removable for allegedly remaining in the United States after the expiration of his

authorized stay, in fact, he was arrested *before* any revocation occurred, and cannot have

been overstaying his visa at the time of his arrest. Pet. ¶ 72. In addition, although the

NTA indicated that Mr. H allegedly "entered the U.S. at an 'unknown port of entry,'" in

fact he lawfully entered through the Los Angeles International Airport, which they knew.

Pet. ¶ 75. Further, in a memo seemingly dated March 23, 2025, which was never served on Mr. H until after his arrest, the State Department appears to inform DHS that Petitioner's F-1 visa was revoked due to his misdemeanor conviction. Pet. ¶ 76. But again, this purported revocation of Mr. H's visa status did not occur until after his March 27th arrest, and there is no legal basis for making revocations retroactive. Pet. ¶¶ 77–79. And the indication in SEVIS that his visa had been revoked under the Foreign Policy Ground was later "corrected," but it existed in the system for more than a week. Petitioner also claims that the documents DHS provided on April 7th, three days before his hearing before the IJ to support its removal action, constitute post hoc, legally baseless, and constitutionally deficient rationales. Pet. ¶¶ 80–84.

### *Petitioner's Claims and Procedural History*

In his Petition, Mr. H asserts four claims. First, he alleges that he is being detained because he exercised his right to freedom of speech under the First Amendment. Pet. ¶¶ 113–18 (First Claim); *id.* ¶¶ 3, 32–33, 39; Pet'r's Decl. ¶¶ 14–23. Mr. H asserts that Respondents have arrested and detained him to send a message to international students in the United States that even if such persons comply with all legal requirements and maintain valid status, they are not safe from arrest if they express political views disfavored by the Executive Branch. Pet. ¶¶ 54, 113–18. Second, Petitioner claims that his detention violates his Fifth Amendment right to due process because it bears no reasonable relationship to any legitimate government purpose and is, therefore, punitive. Pet. ¶¶ 119–25 (Second Claim). Third, he claims that Respondents violated the Administrative Procedure Act when they retroactively terminated his SEVIS record

without statutory authority, any factual justification, or procedural compliance. Pet. ¶¶ 126–32 (Third Claim). And finally, because he claims he is detained without lawful authority, he seeks releas on bail pending adjudication of his Petition. Pet. ¶¶ 133–37 (Fourth Claim).

Mr. H filed the Petition on May 2, 2025, along with a motion for a Temporary Restraining Order and an Emergency Preliminary Injunction. On May 5, 2025, the matter was assigned to this Court, and the Court issued an Order later that day temporarily enjoining Respondents from "moving the Petitioner out of the District of Minnesota until the Court has an opportunity to decide the pending TRO motion." Order at 2, ¶ 1 (May 5, 2025), ECF No. 11.[6] Noting that counsel for the Respondents had been made aware of the filings in this matter, the Court instructed "[c]ounsel for the parties . . . to meet and confer immediately regarding . . . [w]hether an interim agreement can be entered about any of the requested substantive relief" and "[a]n appropriate briefing and hearing schedule for resolution of the TRO Motion." *Id.* at 2, ¶ 2. Finally, the Court set a telephonic status conference for 2:30 p.m. on Tuesday, May 6, 2025, to discuss the parties' conversations. *Id.* at 2.

Prior to the status conference, counsel for Petitioner advised the Court that Respondents consented not to transfer Mr. H out of the District through May 29, 2025, the date of Mr. H's next hearing before an immigration judge in his ongoing removal

---

[6] The Court instructed Respondents that they could seek relief at any time from the Order precluding moving Mr. H out of the District by filing a motion. Although Respondents aver that the Court's Order on transfer while the Petition is pending is unlawful, Resp't's Resp. 41–43, ECF No. 15, they have not filed a motion challenging that Order.

proceedings. Robinson Decl. ¶ 17. Respondents also agreed to provide Mr. H and the Court advance notice prior to any transfer of Mr. H outside of the District, and the parties agreed to a briefing schedule addressed to the merits of the petition. The Court held the status conference with the parties on May 6th, as scheduled, and expressed appreciation for the swift conferring by the parties. During that call, the parties confirmed that a ruling was no longer required on the motion for a TRO and for preliminary injunctive relief, and the Court could proceed directly to considering the merits of the petition. The Court issued a briefing order based on the parties' agreement.

Neither side has requested an evidentiary hearing. However, the parties were free to submit any evidence they wished in support of their respective positions, and both the Petitioner and the Respondents did so. The Court considers the Petitioner's motion for preliminary injunctive relief to be moot and proceeds to the merits of the Petition at the request of the parties.

## DISCUSSION

### I.    Habeas Corpus

A district court may grant a writ of habeas corpus to any person who demonstrates he is in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2241(c)(3). The right to challenge the legality of a person's confinement "through a petition for a writ of habeas corpus . . . extends to those persons challenging the lawfulness of immigration-related detention." *Deng Chol A. v. Barr*, 455 F. Supp. 3d 896, 900–01 (D. Minn. 2020) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 485 (1973);

16

*Zadvydas v. Davis*, <u>533 U.S. 678, 687</u> (2001); and *Demore v. Kim*, <u>538 U.S. 510, 517</u>
(2003)).

      "Petitioner 'bears the burden of proving that he is being held contrary to law; and
because the habeas proceeding is civil in nature, he must satisfy his burden of proof by a
preponderance of the evidence.'" *Freeman v. Pullen*, <u>658 F. Supp. 3d 53, 58</u> (D. Conn.
2023) (quoting *McDonald v. Feeley*, <u>535 F. Supp. 3d 128, 135</u> (W.D.N.Y. 2021)); *Lavalle
v. Martinez*, <u>609 F. Supp. 3d 164, 171</u> (E.D.N.Y. 2022) (same) (quoting *Skaftouros v.
United States*, <u>667 F.3d 144, 158</u> (2d Cir. 2011)); *Bradin v. United States Probation and
Pretrial Servs.*, No. 22-cv-3032-JWL, <u>2022 WL 1154622</u>, at *3 (D. Kan. Apr. 19, 2022)
(citing cases discussing burden of proof in a habeas case under § 2241).

## II.    Analysis

### A. Jurisdiction

      Respondents first argue that this Court lacks jurisdiction to decide Mr. H's habeas
petition. Respondents rely upon four separate statutes to support this position. First,
Respondents characterize the Petition as actually challenging the underlying decision to
revoke Mr. H's visa and argue that <u>8 U.S.C. § 1201(i)</u> bars judicial review of that
discretionary decision by the Secretary of State. Second, they argue that the Petition in
fact seeks district court review of the Secretary of DHS's decision to initiate removal
proceedings against Mr. H, but judicial review is prohibited by <u>8 U.S.C. § 1252(g)</u>. Third,
Respondents assert that the Court lacks the authority to review the DHS Secretary's
discretionary decision to initially detain Mr. H because <u>8 U.S.C. § 1226(e)</u> bars judicial
review. Finally, Respondents contend that Petitioner's constitutional claims under the

First and Fifth Amendments must be channeled to the appropriate circuit court of appeals

pursuant to 8 U.S.C. § 1252(a)(5), (b)(9), and this Court lacks jurisdiction to decide them.

The Court disagrees. Mr. H has filed a habeas petition seeking his release from custody,

and the Court, at a minimum, has jurisdiction over that. *See Mohammed H. v. Trump*, No.

25-cv-1576 (JWB/DTS), 2025 WL 1334847, at *3 (D. Minn. May 5, 2025) (rejecting

identical challenges to jurisdiction in a similar habeas case).

In 28 U.S.C. § 2241, Congress explicitly provided that district courts have the

power to grant a writ of habeas corpus to a person who is in custody in violation of the

Constitution or laws of the United States. 28 U.S.C. § 2241(c)(3). And habeas corpus

review has long played an important role in immigration cases. As the Supreme Court has

said:

> Before and after the enactment in 1875 of the first statute
> regulating immigration, 18 Stat. 477, . . . [federal habeas
> corpus] jurisdiction was regularly invoked on behalf of
> noncitizens, particularly in the immigration context. . . . In case
> after case, courts answered questions of law in habeas corpus
> proceedings brought by aliens challenging Executive
> interpretations of the immigration laws.

*INS v. St. Cyr*, 533 U.S. 289, 305–06 (2001). "At its historical core, the writ of habeas

corpus has served as a means of reviewing the legality of Executive detention, and it is in

that context that its protections have been strongest." *Id.* at 301; *see also Boumediene v.

Bush*, 553 U.S. 723, 742–43 (2008) (discussing the history of the writ, explaining that the

Framers' "inherent distrust" of undivided power led to the adoption of separation-of-

powers principles that serve "not only to make Government accountable but also to

secure individual liberty," and because that structure, "like the substantive guarantees of

18

the Fifth and Fourteenth Amendments . . . protects persons as well as citizens, foreign nationals who have the privilege of litigating in our courts can seek to enforce separation-of-powers principles").

It is true, however, that Congress has the power to modify the right to seek the writ under certain circumstances. *See Ozturk v. Trump*, No. 2:25-cv-374, 2025 WL 1145250, at *12 (D. Vt. Apr. 18, 2025) ("Congress may modify or eliminate the right to seek the writ if Congress provides 'a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention.'") (quoting *Swain v. Pressley*, 430 U.S. 372, 381 (1977)). Congress included certain "jurisdiction-stripping" provisions in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 204-208, 110 Stat. 3009, and the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 302. And the REAL ID act notes that the jurisdiction-stripping provisions of the IIRIRA apply to habeas petitions. Pub. L. 10-13, 119 Stat. 302. However, as explored below, these proscriptions do not eliminate habeas jurisdiction over all immigration-related detention claims, and they do not extend to the claims Mr. H asserts in this case. *See Ozturk v. Hyde*, No. 25-1019, ___ F.4th ___, 2025 WL 1318154, at *1 (2d Cir. May 7, 2025) (denying the government's motion to stay the district court's order that petitioner be transferred from Louisiana to Vermont and finding that the government failed to show it was likely "to prevail on its arguments that various jurisdiction-stripping provisions of the [INA] . . . deprive the district court of jurisdiction over Ozturk's challenge to her detention"). And the Court finds that the statutes relied upon by the Respondents do not undermine its jurisdiction over Mr. H's Petition.

19

First, Section 1252(g) provides the following:

> Except as provided in this section and notwithstanding any
> other provision of law (statutory or nonstatutory), including
> section 2241 of Title 28, or any other habeas corpus provision,
> . . . no court shall have jurisdiction to hear any cause or claim
> by or on behalf of any alien arising from the decision or action
> by the Attorney General to commence proceedings, adjudicate
> cases, or execute removal orders against any alien under this
> chapter.

8 U.S.C. § 1252(g). But the Supreme Court has explained that this provision is narrow—

it applies "only to three discrete actions that the [DHS Secretary] may take: her 'decision

or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno

v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) ("*AADC*"); *see

also Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (citing *AADC*, 525 U.S. at 482–83,

and explaining that "we read the [arise from] language [in 8 U.S.C. § 1252(g)] to refer to

just those three specific actions themselves"). Here, the Petition asserts no such

challenge; instead, Mr. H claims that his detention violates the First and Fifth

Amendments of the Constitution. Section 1252(g) cannot be read to deprive the Court of

jurisdiction to consider a habeas petition raising such claims.

Section 1226(e) is similarly unavailing. That statute does not extend to the

constitutional claims Mr. H asserts here because he does not challenge discretionary

judgments of the responsible government official. Section 1226(e) provides that the DHS

Secretary's "discretionary judgment regarding" the application of § 1226's provisions,

including those concerning detention of noncitizens during the pendency of removal

proceedings and release on bond (§ 1226(a), (b)), "shall not be subject to review." 8

20

U.S.C. § 1226(e). It states that "[n]o court may set aside any action or decision by the [DHS Secretary] under this section regarding the detention of any alien or the revocation or denial of bond or parole." 8 U.S.C. § 1226(e). However, "Section 1226(e) contains no explicit provision barring habeas review," *Demore v. Kim*, 538 U.S. 510, 517 (2003), and several courts, including the Supreme Court, have held or implied that it does not bar jurisdiction over habeas petitions, *Jennings*, 583 U.S. at 295–96 (discussing limits of prohibition on judicial review in § 1226(e) and reaching the merits of a habeas petition); *Mahdawi v. Trump*, No. 2:25-cv-389, 2025 WL 1243135, at *6 (D. Vt. Apr. 30, 2025) (explaining that section "1226(e) does not preclude review through habeas procedures of claims that administrative action violates the Constitution"); *Ozturk*, 2025 WL 1145250, at *10 ("§ 1226(e) does not operate as a categorical bar to habeas review of detention.").

Section 1201, the third statute invoked by the Respondents to contest jurisdiction, governs the issuance and revocation of immigrant and nonimmigrant visas.[7] Section 1201(i) states that the Secretary of State may revoke a visa after it has issued "in his discretion." 8 U.S.C. § 1201(i). Further, it provides that "[t]here shall be no means of judicial review (including review pursuant to section 2241 of title 28 or any other habeas corpus provision . . .) of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under

---

[7] The INA distinguishes between "immigrant visas," 8 U.S.C. § 1101(a)(16), and "nonimmigrant visas," 8 U.S.C. § 1101(a)(26). Immigrant visas are issued to persons who wish to live permanently in the United States, and nonimmigrant visas are issued to those who are vising the U.S. on a temporary basis, including for study. U.S. Customs and Border Protection, *What is the difference between an Immigrant Visa vs. Nonimmigrant Visa?* (July 19, 2024), https://perma.cc/8DQY-A5CJ.

section 1227(a)(1)(B) of this title." 8 U.S.C. § 1201(i). Here, Mr. H does not challenge the discretionary revocation of his visa, but instead his unconstitutional detention.

Finally, neither 8 U.S.C. § 1252(a)(5) nor § 1252(b)(9) deprive the Court of jurisdiction in this matter. Admittedly, these statutes provide limits on the authority of district courts to review any final order of removal and funnel such challenges to the appropriate courts of appeals. But review of an order of removal is not the relief Mr. H seeks in his Petition. Again, the Supreme Court's decision in *Jennings* is instructive. 538 U.S. at 294–95 ("For present purposes, it is enough to note that respondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar."); *Ozturk*, 2025 WL 1145250, at *13 (finding that neither of these provisions was applicable under similar circumstances).[8] In

---

[8] As stated by another Court facing similar claims to those raised by Mr. H:

> The Court offers one final observation about the government's argument that constitutional challenges to detention must be brought first to an Immigration Judge, then to the Board of Immigration Appeals, and finally via a petition for review to the court of appeals. There are serious questions about whether that process would be an adequate substitute for the writ of habeas corpus in district court, given the limited scope of administrative review. . . .
>
> . . . .
>
> Consider that the government's argument on this issue boils down to a bold statement that no matter how egregious the type or quantity of First Amendment or due process violations committed by the government in detaining an individual, an Article III court *cannot* consider any alleged constitutional violations until the Article II employees, with no power to consider or address those violations, have moved the case through their lengthy process. Put another way, the government argues that § 1226(a) grants practically limitless, unreviewable power to detain individuals for weeks or months, even if the detention is patently unconstitutional. Fortunately, this Court need not rule on the merits of that argument today, given the Court's rejection of the jurisdictional bar on other grounds.

*Ozturk*, 2025 WL 1145250, at *15.

sum, the Court finds it has jurisdiction to consider Mr. H's Petition to the extent he

challenges his detention as unconstitutional. None of the arguments raised by

Respondents, nor the statutes they rely upon, requires a different conclusion.

### B. First Amendment Retaliation

Petitioner asserts he is in custody in violation of the Constitution of the United

States because Respondents have retaliated against him based on his protected speech

protected by the First Amendment. Pet. ¶¶ 113–18. Under the First Amendment,

"Congress shall make no law . . . abridging the freedom of speech. . . ." U.S. Const.

amend. I. The greatest protection is reserved for speech on matters of public concern:

> Speech on matters of public concern is at the heart of the First
> Amendment's protection. . . . The First Amendment reflects a
> profound national commitment to the principle that debate on
> public issues should be uninhibited, robust, and wide-open. . . .
> That is because speech concerning public affairs is more than
> self-expression; it is the essence of self-government. . . .
> Accordingly, speech on public issues occupies the highest rung
> of the hierarchy of First Amendment values, and is entitled to
> special protection.

*Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (cleaned up). Speech falls into this

specially protected category "when it can 'be fairly considered as relating to any matter

of political, social, or other concern to the community,' or when it 'is a subject of

legitimate news interest; that is, a subject of general interest and of value and concern to

the public[.]'" *Id.* at 453 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983) and *San

Diego v. Roe*, 543 U.S. 77, 83–84 (2004)) (internal citations omitted).

The First Amendment not only protects speech, but it forbids government action

punishing such speech. "As a general matter the First Amendment prohibits government

officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

Critically, the First Amendment right to free speech protects citizens and noncitizens alike, and applies broadly to those in the United States. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and press is accorded aliens residing in this country."); *Mohammed H.*, 2025 WL 1334847, at *5 (citing *Bridges*, 326 U.S. at 148).

For Mr. H to show that Respondents retaliated against him in violation of his First Amendment rights, he must demonstrate that (1) he engaged in protected activity; (2) adverse action was taken against him that would chill a person of ordinary firmness; and (3) a causal connection between a retaliatory motive and the adverse action. *See Watson v. Boyd*, 119 F.4th 539, 550 (8th Cir. 2024); *Nieters v. Holtan*, 83 F.4th 1099, 1110 (8th Cir. 2023) (same); *Quraishi v. St. Charles Cnty., Mo.*, 986 F.3d 831, 837 (8th Cir. 2021) (same).

### Protected Speech

Mr. H has demonstrated that he engaged in protected speech, both as part of his participation in protests against misuse of force by police and through his publication, on his personal and business social media accounts, of statements voicing opposition to violence in Palestine and support for the lives of Palestinians in the West Bank and Gaza.

24

This constitutes speech on matters of public concern and therefore lies at the heart of First Amendment protection. *Mohammed H.*, 2025 WL 1334847, at *5; *Snyder*, 562 U.S. at 451–53 (discussing the broad scope of matters of public concern). Respondents do not dispute that Mr. H engaged in protected First Amendment activity. The first element of the test for retaliation is met.

### Chilling Effect

In addition, Respondents make no argument that subjecting a person to detention pending removal proceedings based on his political speech would not have a chilling effect on the exercise of protected First Amendment activity. The Court finds that it would. The threat of being detained in Kandiyohi County Jail (or some other detention facility to which Respondents may choose to relocate Mr. H based on their own unilateral determinations) not only prevents Mr. H from continuing to engage in protected First Amendment activity, but also would chill an ordinary person from sharing their views on the same subject matter. *Mohammed H.*, 2025 WL 1334847, at *5 (citing *Thuriairajah v. City of Fort Smith, Ark.*, 925 F.3d 979, 985 (8th Cir. 2019)); *Holyland v. McMenomy*, 869 F.3d 644, 657 (8th Cir. 2017) ("[T]here can be little doubt that 'being arrested for exercising the right to free speech would chill a person of ordinary firmness from exercising that right in the future.'") (quoting *Clary v. City of Cape Girardeau*, 165 F. Supp. 3d 808, 826 (E.D. Mo. 2016)), *abrogated on other grounds by Nieves*, 587 U.S. 391. Here, the detention of Mr. H and others for speech plainly sends a message to everyone, particularly noncitizens. Pet'r's Decl. ¶ 47 ("Had I known back in 2021 that my peaceful protest activities and social media posts would lead to my arrest in 2025, I

would not have done this. . . . [T]he cost of being detained and separated from my wife and daughter is too high now."); Thompson Decl. ¶ 20, <u>ECF No. 20</u>. It seems likely that this message is part of the point. U.S. Dep't of State, *Secretary of State Marco Rubio Remarks to the Press* (Mar. 28, 2025) ("[I]f they seek to self-deport they can do that, because that's what we've done. We're basically asking them to leave the country. *That's why they've been detained*. They can do so tomorrow. Buy an airplane ticket and leave."), <u>https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3</u>. The second prong of the test is met.

### *Causal Connection*

The third prong of the test is the one most specifically disputed by the Respondents: whether there is a causal connection between Mr. H's speech and his detention. The Court finds that Mr. H has made the required showing. Several categories of evidence in the record support this conclusion.

First, the evidence and public record materials submitted in support of Mr. H's Petition, including credible news reporting, evince an Executive policy to target noncitizen students located in the United States based on the expression of viewpoints about matters of public concern disfavored by the government. Executive Order 14161 demonstrates the government's intent to focus on the vaguely defined category of noncitizens within the United States who purportedly bear "hostile attitudes" toward Americans or U.S. culture and institutions. It instructs the State Department and DHS to "vet[] and screen[] [such persons] to the maximum degree possible." <u>90 Fed. Reg. 8451</u>. Executive Order 14188 similarly conscripts colleges and universities into monitoring and

reporting on foreign students' activities so that the government can pursue them. 90 Fed.
Reg. 8847. Statements by officials within the Executive Branch further illustrate the
government's focus on foreign students' speech disfavored by the Executive Branch.
Pet'r's Reply at 30–31 nn. 28–30.

Petitioner has also shown the government's retaliatory motivation through similar
contemporaneous cases involving students that have been detained after engaging in
speech like Mr. H's, supporting Palestinian human rights and deploring violence directed
at Palestinians. Pet. ¶¶ 32, 24, 40. The evidence before the Court indicates that the State
Department has, since at least 2019, been collecting and retaining information about
foreign student visa holders' social media accounts. It also shows that Respondents have
used electronic tools to comb social media accounts in an effort to implement Executive
Orders 14161 and 14188.

Next, Petitioner shows that he has been treated differently than other foreign
students with criminal records who did not engage in protected activity like he did and
who were neither arrested nor detained. The record reflects that DHS created the Student
Criminal Alien Initiative to run the names of 1.3 million student visa holders through
NCIC and terminate the SEVIS records for thousands of individuals who had law
enforcement contact recorded in that database. However, for those who did not engage in
protected speech, Mr. H has shown that the government's enforcement stopped short of
arrest and detention. Doyle Decl. ¶¶ 9–11 (noting that despite the termination of several
thousand international students' SEVIS records based on interactions with the criminal
justice system, only a small handful of those students were arrested and detained by

27

DHS); Pet'r's Mem. in Supp. of Mot. for Temp. Restraining Order at 29–30 (citing Watson Decl. ¶21; *Deore v. Noem*, No. 2:25-cv-11038, Doc. No. 14-3 (E.D. Mich. Apr. 14, 2025); *Isserdasani v. Noem*, No. 25-cv-283-WMC, 2025 WL 1118626, at *4 (W.D. Wis. Apr. 15, 2025), ECF No. 4. Respondents do not dispute that they have treated other foreign students studying in the United States whose visas have been revoked differently from Mr. H and others who engaged in protected speech—namely, by detaining only the latter.

Moreover, based on the record here, the Court finds it is more reasonable to infer that Respondents have detained Mr. H in retaliation for his speech than because of any professed public safety concern. The evidence offered by Respondents to demonstrate a purportedly non-retaliatory motive is simply too vague and inconsistent to support the conclusion Respondents ask the Court to reach. For example, the March 23rd State Department memo indicates that DHS/ICE initially reviewed Mr. H's eligibility for a visa, determined that he was ineligible, and then contacted the State Department seeking its agreement on that point. But Respondents have not produced the purported initial March 22nd communication from DHS/ICE to the State Department, so it does nothing to dispel the indication that Petitioner was identified based on the government's targeting of protected speech. And the Respondents offer no direct evidence to deny or refute that the initial decision to contact the State Department and ultimately pursue Mr. H's detention was related to Mr. H's protected speech. The timing is even further clouded by the suggestion in a May 8, 2025 brief filed by DHS before the BIA that ICE received information about Petitioner's criminal history on March 24, 2025, Second Gad Decl.,

Ex. 17, which is after the State Department's purported revocation at the initiation of

DHS. That same March 24th date is reflected in Mr. H's A-file. Gad Decl. Ex. 3 at 3.

Further, according to the March 23rd memo, DHS/ICE had apparently already

determined that it would immediately pursue removal of Mr. H *before* the State

Department responded and advised that Petitioner's visa had been swiftly revoked. This

flatly undercuts Respondent's stated justification that Petitioner was detained for

purposes of effectuating his removal simply because his visa was revoked by the State

Department. And DHS/ICE had already purportedly determined that Mr. H posed a threat

to public safety based on his misdemeanor graffiti conviction. This evidence is

accompanied by no explanation of how ICE became aware of Mr. H's criminal history or

why it sought out the State Department's intervention and revocation of Petitioner's visa,

let alone what about that nearly two-year old non-violent misdemeanor illustrates a

present threat to public safety. *Mohammed H.*, 2025 WL 1334847, at *5 ("Rather than

providing evidence of a lawful basis to act against Petitioner, the March 23 memo

reinforces Petitioner's claim that DHS had already determined it would act to remove

him, and the visa revocation came after as the purported legal justification.").[9]

It is also telling that Mr. H's property-damage misdemeanor presented no barrier

to his entry to the United States upon his late-April 2024 return from a trip to see his

family in Indonesia. Respondents have in no way rebutted Mr. H's evidence

demonstrating that the government was fully aware of his two-year-old conviction when

---

[9] The Court notes that the numerous similarities between Mr. H's case and that of *Mohammed H.* provide further support for a finding of retaliatory motive here.

he reentered the country at LAX. That Petitioner's criminal history was the same upon

that encounter with immigration authorities undermines the Respondents' suggestion that

his criminal history, not his protected First Amendment speech motivated the detention

decision in this case.

The inference of retaliatory motive is further supported by DHS first citing and

then abruptly disavowing the Foreign Policy Ground as the stated justification for

termination of Mr. H's SEVIS record. The record shows that *after* Mr. H was arrested by

ICE agents at his job on March 27, 2025, his SEVIS record was terminated based on the

Foreign Policy Ground. Although Respondents argue that the Secretary of State never

made a determination under INA § 237(a)(4)(C) and the SEVIS record was manually

"corrected" to show that revocation of his visa was the basis for the SEVIS termination,

they provide no evidence explaining how the Foreign Policy Ground appeared in the first

instance if it was never part of the calculus.

The Court also observes the total lack of evidence offered by the Respondents that

the actual decision-makers involved in Mr. H's initial apprehension, continued detention,

and stay of the IJ's order for release on bond were either unaware of or not motivated by

Mr. H's speech. This omission speaks volumes. Deportation Officer Robinson's

declaration actually does nothing to refute the inference that the government's focus on

disfavored student speech motivated ICE's pursuit and detention of Petitioner.

Mr. Robinson declares only that the officers who executed the administrative warrant on

March 27th were unaware of Mr. H's protected speech on social media platforms at the

time they took him into custody. Robinson Decl. ¶ 10. But that assertion says nothing

about what was known to any other ICE representatives or other DHS personnel who directed the arresting agents to apprehend Petitioner. *Mohammed H.*, 2025 WL 1334847, at *4 ("Critically, the Government has not supplied evidence of the reason why DHS/ICE contacted DOS about Petitioner on March 22, 2025."). For example, Respondents say nothing about whether the DHS/ICE officials who sent a communication to the State Department on March 22 knew of the posts on Mr. H's social media accounts when they requested revocation of his visa. Respondents also offer no direct evidence to refute Petitioner's claim that he and others are targeted for detention because of their speech: no declaration disavows the existence of such a policy.

Respondents assert that Mr. H's "claims fail as a matter of law because his removal proceedings and detention follow from the revocation of his visa by the Secretary of State based upon his criminal record." Doc. 15 at 16, 19.[10] The mere fact that Respondents can point to the existence of a misdemeanor conviction does not show that their detention of Mr. H is not motivated by his speech. In referencing his misdemeanor property-damage conviction, Respondents have pointed to a rationale which the Court will assume *could* provide a reason for detention unrelated to speech. But on this record, and with the showing made by Petitioner, it more likely indicates pretext, while the true reason for taking him into custody and detaining him during the ongoing removal

---

[10] Respondents also criticize Petitioner's citation to an April 9, 2025 press release from the United States Customs and Immigration Services regarding use of artificial intelligence tools to review social media posts because it post-dates Petitioner's visa revocation. But Petitioner has pointed to evidence that the State Department has gathered information about visa applicants' social media accounts since 2019. And Petitioner notes reports that the State Department had already admitted to using artificial intelligence and social media surveillance as early as March 6, 2025.

proceedings is retaliation for his public expression of support for Palestinian human rights. Respondents have essentially labeled that viewpoint as disfavored speech through Executive Orders and public expressions of the policy described in the Petition.

And to reiterate, the causal connection at issue here is the tether between Mr. H's exercise of his First Amendment rights and Respondents' continued detention of him. Beyond the evidentiary showing that Petitioner's speech motivated ICE's arrest and initial detention of him, the decision to continue to detain him is not divorced from his speech. As part of the ongoing removal proceedings, ICE has made repeated references to the arrest stemming from Mr. H's presence at a protest. Despite the fact that the prosecutor responsible for that case dismissed the unlawful-assembly charge against Mr. H in the interests of justice, ICE has invoked that case in support of its efforts to keep him detained, including at the bond hearing, Gad Decl., Ex. 4 at 6, and in its brief to the BIA after it applied the automatic stay to prevent Petitioner's release on bond as required by the IJ, Second Gad Decl., Ex. 17, DHS Bond Brief on Appeal at 4. This further implies that his detention is motivated by his support for a particular viewpoint. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. . . . Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."). And Respondents again

offer no evidence that the invocation of an apparently rarely used stay provision to prevent his release by the IJ was not motivated by Mr. H's protected speech.

Respondents argue that Petitioner cannot demonstrate causation because he presents no comparator evidence and offers only supposition that he was targeted for his speech. Doc. 15 at 48–49 (citing *Nieves v. Bartlett*, 587 U.S. 391 (2019) and *Gonzalez v. Trevino*, 602 U.S. 653 (2024) (per curiam)). But as the Court discusses above, Mr. H has in fact provided comparator evidence indicating that other students whose SEVIS records were terminated, but who did not engage in protected speech, were not arrested or detained, and evidence that others who engaged in similar speech were arrested and detained. *Gonzalez*, 602 U.S. at 658 (explaining that the plaintiff's burden does not require presentation of "virtually identical and identifiable comparators").[11] This is classical comparator evidence.

Finally, contrary to Respondents' position, the Court finds neither *Harisiades v. Shaugnessy*, 342 U.S. 580 (1952), nor *Carlson v. Landon*, 342 U.S. 524 (1952) to be "instructive" in this case. Doc. 15 at 18–19 (asserting that *Carlson* "is particularly instructive here"); *id.* at 49–50 (stating that *Harisiades* "is instructive"). DHS and ICE do

---

[11] Both *Nieves* and *Gonzalez* address the causation rules applicable to claims for retaliatory arrest when a plaintiff brings suit against government officials under 42 U.S.C. § 1983. *Nieves*, 587 U.S. at 399 (discussing "causal complexities" in establishing retaliatory-arrest liability and concluding that the plaintiff bringing such a claim must show "the absence of probable cause for the arrest"). However, it is far from clear that the *Nieves* no-probable-cause standard must be applied in the habeas context rather than in the § 1983 context, and Respondents do not point to cases applying it to habeas claims like Mr. H's. *See Welch v. Dempsey*, 51 F.4th 809, 812–13 (8th Cir. 2022) (declining to extend the *Nieves* rule beyond the Fourth Amendment context where courts ignore subjective intent of the officers in favor of a standard of objective reasonableness). This may be because in § 1983 claims, the focus is necessarily on the actions of an individual state official, whereas in habeas cases, "the petition need not identify a particular violator, only that his confinement is unconstitutional." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 700–01 (9th Cir. 2021) (discussing the reasons that *Nieves* was not applicable in a habeas case challenging the lawfulness of a bond-revocation decision in the immigration context).

33

not accuse Mr. H of advocating violence or associating with an organization actively seeking to overthrow the United States government. *See Mohammed H.*, 2025 WL 1334847, at *5 (distinguishing *Harisiades* because "Petitioner is not accused of subversive association or violent ideology. His speech—opposing violence in Palestine— falls within the core of protected expression, which extends to noncitizens").

Accordingly, the Court finds that Mr. H has shown that he is in custody in violation of the First Amendment and is entitled to a writ of habeas corpus for his immediate release. Because the Court concludes that Mr. H prevails on his First Amendment retaliation claim, it does not address his Fifth Amendment Due Process claim or his APA claim.

### III.    Order

As discussed above, **IT IS HEREBY ORDERED THAT:**

1. Petitioner's Motion for Ex Parte Temporary Restraining Order and Emergency Preliminary Injunction, ECF No. 2, are **DENIED as moot**.

2. The Petition, ECF No. 1, is **GRANTED in part**.

3. Petitioner shall be released from custody, immediately, subject to the conditions previously imposed by the Immigration Judge, including the $5,000 bond.

4. Within 48 hours of this Order, Respondents shall notify the Court of the date and time of Petitioner's release.

**Let Judgment be entered accordingly.**

Date: May 14, 2025                              *s/Katherine Menendez*

                                                Katherine Menendez
                                                United States District Judge

34

# UNITED STATES DISTRICT COURT

## District of Minnesota

Aditya Wahyu Harsono,

**JUDGMENT IN A CIVIL CASE**

Petitioner,

v.

Case Number: 25-cv-1976 KMM/JFD

Donald J. Trump, Pamela Bondi, Daniel
Hartog, Matthew Akerson, Peter Berg,
Jamie Holt, Todd Lyons, Kristi Noem, Marco
Rubio,

Respondents.

☐ **Jury Verdict**.  This action came before the Court for a trial by jury.  The issues have been
tried and the jury has rendered its verdict.

☒ **Decision by Court**.  This action came to trial or hearing before the Court.  The issues have
been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

1.  Petitioner's Motion for Ex Parte Temporary Restraining Order and Emergency
    Preliminary Injunction, ECF No. 2, are **DENIED as moot**.

2.  The Petition, ECF No. 1, is **GRANTED in part**.

3.  Petitioner shall be released from custody, immediately, subject to the conditions
    previously imposed by the Immigration Judge, including the $5,000 bond.

4.  Within 48 hours of this Order, Respondents shall notify the Court of the date and time
    of Petitioner's release.

Date: 5/15/2025

KATE M. FOGARTY, CLERK



# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

**Warren E. Burger Federal Building and U.S. Courthouse**
316 North Robert Street
Room 100
St. Paul, MN 55101

**Diana E. Murphy U.S. Courthouse**
300 South Fourth Street
Room 202
Minneapolis, MN 55415

**Gerald W. Heaney Federal Building and U.S. Courthouse and Customhouse**
515 West First Street
Duluth, MN 55802

**Edward J. Devitt U.S. Courthouse and Federal Building**
118 South Mill Street
Fergus Falls, MN 56537

## CIVIL NOTICE

**The appeal filing fee is $605.00. If you are indigent, you can apply for leave to proceed in forma pauperis, ("IFP").**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals or the Federal Circuit Court of Appeals (when applicable) from a final decision of the District Court in a civil case.

*This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.*

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1.  Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or
2.  Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or
3.  Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or
4.  Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 25-cv-1976-KMM-JFD

ADITYA HARSONO,

                  Petitioner,                          **NOTICE OF APPEAL**

     v.

DONALD J. TRUMP, *et al*.,

                  Respondents.

Notice is hereby given that Respondents appeal to the United States Court of Appeals for the Eighth Circuit from the Order entered on May 14, 2025 and Judgment entered May 15, 2025, granting Petitioner's writ of habeas corpus in part. *See* ECF No. 21 (Order), ECF No. 22 (Judgment). The Order, ECF No. 21, is a final appealable order of a district court under 28 U.S.C. § 1291.

Dated: July 11, 2025                     JOSEPH H. THOMPSON
                                     Acting United States Attorney

                                     *s/ Ana H. Voss*
                                     BY: ANA H. VOSS
                                     Assistant United States Attorney
                                     Attorney ID No. 483656DC
                                     600 United States Courthouse
                                     300 South Fourth Street
                                     Minneapolis, MN 55415
                                     Phone: 612-664-5600
                                     Ana.voss@usdoj.gov

                                   *Attorneys for Federal Respondents*



# UNITED STATES DISTRICT COURT DISTRICT OF MINNESOTA

| | | | |
|---|---|---|---|
| **Warren E. Burger Federal Building and U.S. Courthouse** 316 North Robert Street Room 100 St. Paul, MN 55101 | **Diana E. Murphy U.S. Courthouse** 300 South Fourth Street Room 202 Minneapolis, MN 55415 | **Gerald W. Heaney Federal Building and U.S. Courthouse and Customhouse** 515 West First Street Duluth, MN 55802 | **Edward J. Devitt U.S. Courthouse and Federal Building** 118 South Mill Street Fergus Falls, MN 56537 |

## TRANSMITTAL OF APPEAL

Date:   July 14, 2025

To:     U.S. COURT OF APPEALS, 8TH CIRCUIT

From:  LT- U.S. District Court-Minnesota

In Re:  District Court Case No. 25-cv-01976-KMM-JFD
       Eighth Circuit Case No.:  Not yet assigned
       Case Title:  Harsono v. Trump et al

The statutory filing fee has:
    ☐ been paid, receipt number:
    ☐ not been paid as of:
        IFP   ☐ is   ☐ is not pending
    ☒ been waived because:
        ☐ Application for IFP granted  ☒ USA filed appeal

Length of Trial:  N/A

Was a court reporter utilized?  ☒ Yes  ☐ No
    If yes, please identify the court reporter: Paula Richter