No. 25-2413

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

### ADITYA WAHYU HARSONO,

**Petitioner – Appellee,**

**v.**

### MATTHEW AKERSON, *et al.*,

**Respondents – Appellants.**

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA
### District Court Case No. 25-cv-1976-KMM-JFD

## APPELLANTS' MOTION FOR VACATUR AND DISMISSAL
## UNDER *UNITED STATES V. MUNSINGWEAR*, 340 U.S. 36 (1950), AND
## MOTION TO STAY BRIEFING SCHEDULE

**BRETT A. SHUMATE**
**Assistant Attorney General**
**Civil Division**

**YAAKOV M. ROTH**
**Principal Deputy Assistant**
**Attorney General**

**DREW C. ENSIGN**
**Deputy Assistant Attorney General**
**Office of Immigration Litigation**

**MELISSA NEIMAN-KELTING**
**Assistant Director**

**CRAIG A. NEWELL, JR.**
**Senior Litigation Counsel**

**ZACHARY A. CARDIN**
**Trial Attorney**
**Office of Immigration Litigation**
**Civil Division**
**U.S. Department of Justice**

# INTRODUCTION

Appellants, through undersigned counsel, respectfully move this Court to vacate the underlying district court order and dismiss the case as moot under *United States v. Munsingwear*, 340 U.S. 36 (1950). Appellants also respectfully request that the Court stay the briefing schedule pending the resolution of this motion.

In this appeal, Appellants are challenging the district court's May 14, 2025 order, which granted in part the petition for a writ of habeas corpus filed by Petitioner - Appellee Aditya W. Harsono ("Harsono") and ordered his release from detention subject to the conditions previously imposed by the Immigration Judge, including the $5,000 bond. *See Aditya H. v. Trump*, 782 F. Supp. 3d 691 (D. Minn. 2025) (attached as Exhibit A). During the pendency of this appeal, the Board of Immigration Appeals ("Board") affirmed on the merits the Immigration Judge's decision granting Harsono's request for a custody redetermination and setting bond in the amount of $5,000. *See* Exhibit B (Board's Aug. 6, 2025 order).

Because of this intervening circumstance, there is no longer any dispute over whether Harsono may be detained during his pending removal proceedings; the Board's decision precludes the Department of Homeland Security ("DHS") from re-detaining Harsono while those proceedings remain pending, regardless of the outcome of this appeal. Therefore, Harsono's habeas claim has become moot

pending appeal through happenstance and no fault of the Government, and it is in the public interest to vacate the district court's order. *See Munsingwear*, 340 U.S. at 39-40; *Panera, LLC v. Dobson*, 999 F.3d 1154, 1158 (8th Cir. 2020). The Court should grant Appellants' motion for vacatur and dismissal under *Munsingwear*.

On December 8, 2025, Harsono's counsel of record, Kshithij Shrinath, Esq., informed undersigned counsel that Appellee opposes this motion. If the Court denies the motion, Appellants respectfully request that the briefing schedule be reset to allow 30 days from the date of the Court's order for Appellants to file the opening brief.

## BACKGROUND

Harsono is a 34-year-old native and citizen of Indonesia, who was admitted to the United States on a non-immigrant student visa. ECF No. 7-2 at 2; ECF No. 7-3 at 4; ECF No. 7-6 at 7.[1] His first admission to this country was in January 2015, and his most recent admission was in April 2024, after returning from a trip abroad. ECF No. 7-2 at 2; ECF No. 7-3 at 4; ECF No. 7-6 at 7-8.

On February 7, 2023, Harsono was convicted pursuant to his guilty plea to the offense of criminal damage to property in the fourth degree under Minn. Stat. § 609.595.3, and he was sentenced to 90 days in county jail, stayed for one year.

---

[1] Citations to the electronic case files ("ECF") refer to the district court docket in the underlying action.

3

ECF No. 7-6 at 44-50. This conviction arose out of an incident in which Harsono vandalized four commercial vehicles with graffiti, causing damage to the property owner in the amount of almost $5,000. ECF No. 7-4 at 13-25; ECF No. 7-6 at 38-39.

On March 23, 2025, the Department of State, exercising its discretionary authority under 8 U.S.C. § 1201(i), revoked Harsono's student visa based upon information provided by DHS regarding his criminal damage to property charge and an assessment that Harsono posed a threat to U.S. public safety. ECF No. 7-9 at 31; ECF No. 17 at 3. Because of this revocation, Harsono is subject to removal under 8 U.S.C. § 1227(a)(1)(B), as an alien "whose nonimmigrant visa . . . has been revoked under section 1201(i)." 8 U.S.C. § 1227(a)(1)(B). ECF No. 7-14.

On March 27, 2025, DHS arrested Harsono for the purpose of taking him into custody for removal proceedings, and DHS accordingly placed him in detention at Kandiyohi County Jail in Willmar, Minnesota. ECF No. 16; ECF No. Doc. 16-1. The next day, DHS served Harsono with a Notice to Appear in removal proceedings, and DHS commenced removal proceedings by filing the Notice to Appear in the immigration court in Fort Snelling, Minnesota. ECF No. 7-2.

On April 10, 2025, after holding a hearing on Harsono's request for bond, the Immigration Judge issued a bond redetermination decision, finding that Harsono was not a danger to persons or property and setting bond at $5,000. ECF

Appellate Case: 25-2413     Page: 4     Date Filed: 12/08/2025 Entry ID: 5585709

No. 7-7; *see* 8 C.F.R. § 1003.19 (regulation governing custody and bond redeterminations). That same day, however, DHS filed an administrative appeal of the immigration judge's order with the Board, and it also filed the required notice to invoke the authority in 8 C.F.R. § 1003.19(i)(2), which had the effect of automatically staying the Immigration Judge's order granting release on bond. ECF No. 7-8; ECF No. 7-9.

On May 1, 2025, the Immigration Judge issued a written order in which she denied Harsono's motion to terminate his removal proceedings and sustained DHS's charge of removal under 8 U.S.C. § 1227(a)(1)(B). ECF No. 7-10. The removal proceedings before the immigration judge are still ongoing.

On May 2, 2025, Harsono filed his habeas petition with the district court. ECF No. 1. Relevant here, Harsono alleged that the Government retaliated against him for his exercise of his First Amendment right to free speech, specifically his "support of Palestinian rights and racial justice in policing." ECF No. 1 at 37.

On May 14, 2025, the district court granted in part Harsono's habeas petition and ordered his release from detention subject to the conditions previously imposed by the Immigration Judge, including the $5,000 bond. ECF No. 21. On May 15, 2025, the district court entered its final judgment. ECF No. 22. On that same day, DHS released Harsono from custody upon his posting of the $5,000

5

immigration bond. ECF No. 23. This timely appeal followed. ECF No. 24; *see* 28 U.S.C. § 1291; Fed. R. App. P. 4(a)(1)(B).

On August 6, 2025, during the pendency of this appeal, the Board issued a final order for Harsono's bond proceedings in which it dismissed DHS's bond appeal and affirmed the immigration judge's bond redetermination on the merits. *See* Ex. B.

## ARGUMENT

This Court should vacate the underlying district court's order and dismiss Harsono's habeas case as moot under *Munsingwear*. "'Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies.'" *Missouri v. Craig*, 163 F.3d 482, 484 (8th Cir. 1998) (quoting *Lewis v. Continental Bank. Corp.*, 494 U.S. 472, 477 (1990)). "A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III— when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc*, 568 U.S. 85, 90-91, 13 (2013) (internal quotation marks and citation omitted). An "actual controversy" must exist throughout "*all stages*" of the litigation; if not, the case has become moot, and the Court must dismiss it for lack of jurisdiction. *Id.* (emphasis added); *see Craig*, 163 F.3d at 484 ("'It is of no consequence that the controversy was live at earlier stages in this case; it must be live when we decide the issues.'") (quoting

*South Dakota v. Hazen*, 914 F.2d 147, 150 (8th Cir. 1990)). To do otherwise, would amount to "issu[ing] an advisory opinion." *Perficient, Inc. v. Munley*, 973 F.3d 914, 916 (8th Cir. 2020); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'") (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).

When a case becomes moot "through happenstance" before this Court issues a decision on appeal, the Court will generally vacate the district court's judgment below and remand with directions to dismiss the case. *Munsingwear*, 340 U.S. at 39-40; *see Panera*, 999 F.3d at 1158 ("In similar cases of mootness, both our precedent and that of the Supreme Court typically favor vacating the lower court's judgment."). While "vacatur is an equitable remedy, not an automatic right," granting vacatur is this Court's "normal practice" because "doing so 'clears the path for future litigation' by eliminating a judgment the loser was stopped from opposing on direct review." *Moore v. Thurston*, 928 F.3d 753, 758 (8th Cir. 2019) (quoting *Arizonans for Official English v. Ariz.*, 520 U.S. 43, 71 (1997), which in turn was quoting *Munsingwear*, 340 U.S. at 40); *see Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 22 (2023) (stating that the Supreme Court's "*Munsingwear* practice is well settled," and declining an "invitation to reconsider it"); *Panera*,

7

999 F.3d at 158 ("Doing so enables the parties to litigate their issues on a clean slate.").

Vacatur of the lower court judgment is appropriate if the case was rendered moot through no fault of the party seeking relief from the judgment below and if vacatur serves the public interest. *See Panera*, 999 F.3d at 1158; *Moore*, 928 F.3d at 758. "The consideration of fault concerns 'whether the party seeking relief from the judgment below caused the mootness by voluntary action.'" *Panera*, 999 F.3d at 1158 (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (2021)). Voluntary action occurs when the losing party declines to pursue its appeal, enters a settlement that moots the case, or takes some other action that "closely resembles settlement." *Panera*, 999 F.3d at 1158 (citing *Alvarez v. Smith*, 558 U.S. 87, 93-96 (2009); *Bancorp*, 513 U.S. at 25). "By contrast, '[a] party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstances, ought not in fairness by forced to acquiesce in the judgment.'" *Panera*, 999 F.3d at 1158 (quoting *Bancorp*, 513 U.S. at 25).

Here, vacatur is appropriate because Harsono's habeas case has become moot because of the happenstance occurrence of the Board's decision affirming the Immigration Judge's bond redetermination on the merits. *See Munsingwear*, 340 U.S. at 39-40; *Panera*, 999 F.3d at 1158. Harsono's habeas petition challenged on constitutional grounds the lawfulness his detention for purposes of his removal

8

proceedings. *See* ECF. No. 1; *see also Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody."); 8 U.S.C. § 1226(a) (statutory authority to arrest and detain "pending a decision on whether the alien is to be removed from the United States"). The Board's affirmance of the Immigration Judge's grant of release on bond for his removal proceedings, *see* Ex. B, however, ended any actual controversy over whether Harsono may be detained for the remaining pendency of those proceedings, *see Already, LLC*, 568 U.S. at 90-91 (explaining that an actual controversy must exist "through all stages of the litigation"). Indeed, the Board provided Harsono with essentially the same relief from custody that he obtained from the district court, and its intervening order precludes DHS from re-detaining Harsono for the remainder of his removal proceedings, just like the district court's order does. *See Riley v. INS*, 310 F.3d 1253, 1256-57 (10th Cir. 2002) (holding that INS's release of petitioner "from detention moots his challenge to the legality of his extended detention," where petitioner requested "immediate release from custody under adequate and reasonable supervision"); *Simpson v. Camper*, 974 F.2d 1030, 1031 (8th Cir. 1992) (concluding that habeas petition was moot because of intervening state court decision "granting petitioner essentially the same relief that she had obtained in the District Court below," and vacating the district court's decision).

9

Therefore, the Board's intervening decision renders it "impossible" for this Court to grant "any effectual relief whatever" to the Government if it were to prevail on appeal, and Harsono's habeas action and this appeal are consequently moot. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992); *see, e.g.*, *Riley*, 310 F.3d at 1256-57; *Camper*, 974 F.2d at 1031. Any change in circumstances that would potentially permit DHS to detain Harsono sometime in the future does not obviate the mootness of this present case. Such future developments are speculative at this moment, and any future decision by DHS to detain Harsono would require a different factual and statutory predicate for detention, consequently raising different controversies than the ones that were at issue before the district court. *See, e.g.*, 8 U.S.C. § 1226(c) (mandatory detention for certain criminal aliens); 8 U.S.C. § 1231(a) (detention authority for aliens with final orders of removal); *Rodney v. Mukasey*, 340 F. App'x 761, 764 (3d Cir. 2009) (concluding that habeas petition challenging detention under 8 U.S.C. § 1226(c) was moot, where petitioner was "no longer in custody pursuant to this statute" and any challenge to his post-removal order detention under 8 U.S.C. § 1231(a) "would be premature and unfounded"); *cf. Banyee v. Bondi*, 115 F.4th 928 (8th Cir. 2024), *reh'g denied,* 131 F.4th 823 (8th Cir. 2025) (panel denied petitioner's motion to vacate based on mootness in an unpublished order where, unlike here, petitioner

10

remained in custody and the intervening event of his final removal order occurred after the panel issued its decision).

Furthermore, the Board's decision constitutes an event of "happenstance" rendering the case moot through no fault of the Government. *Munsingwear*, 340 U.S. at 39-40; *see Panera*, 999 F.3d at 1158-59. The Board's decision does not amount to unilateral voluntary action by the Government that "essentially arranges an appeal's dismissal by settlement," *Panera*, 999 F.3d at 1158, nor was it intended as a basis "to employ the secondary remedy of vacatur as a refined form of collateral attack on the judgment [that] would—quite apart from any considerations of fairness to the parties—disturb the orderly operation of the federal judicial system," *Bancorp*, 513 U.S. at 27. Instead, the Board's decision simply "resulted from the typical progression of events" for bond proceedings as established by regulation and agency precedent. *Hassoun v. Searls*, 976 F.3d 121, 131 (2d Cir. 2020) (internal quotation marks and citations omitted); *see Alvarez*, 558 U.S. at 87-88 (ordering vacatur where "Plaintiffs' [state court] forfeiture cases took place with no procedural link to the case before this Court," and where those state court cases were "apparently terminated on substantive grounds in their ordinary course"); *see also* 8 C.F.R. § 1003.19 (regulation governing custody and bond redeterminations); *Matter of R-A-V-P-*, 27 I. & N. Dec. 803, 804-05 (BIA

Appellate Case: 25-2413     Page: 11     Date Filed: 12/08/2025 Entry ID: 5585709

2020) (describing bond proceedings and delineating factors for determining whether alien's release on bond is merited during removal proceedings).

The Board is an impartial administrative appellate body that exercises delegated authority from the Attorney General. *See* 8 U.S.C. § 1103(g)(2); 8 C.F.R. § 1003.1(a)(1), (d)(1); *see also Liadov v. Mukasey*, 518 F.3d 1003, 1008 (8th Cir. 2008) ("[T]he BIA's jurisdiction is defined by the powers delegated to it by the Attorney General, who has broad power to establish regulations governing immigration proceedings.") (internal quotation marks and citations omitted). DHS vigorously pursued an appeal of the Immigration Judge's bond redetermination before the Board. *See* ECF No. 7-8; ECF No. 7-9. And the Board carried out its delegated duties as an impartial agency adjudicator when it dismissed that appeal, resolving the issue of release on bond in Harsono's favor based on the particular facts and applicable law in his case. *See* Ex. B. Given these circumstances, the Board's decision constitutes a "happenstance" event that mooted Harsono's habeas case through no fault of the Government, and this Court should follow the established practice of vacating the district court's order under *Munsingwear*. *See Acheson Hotels*, 601 U.S. at 22; *Alvarez*, 558 U.S. at 87-88; *Munsingwear*, 340 U.S. at 39-40; *Panera*, 999 F.3d at 1158-59; *see also Ali v. Cangemi*, 419 F.3d 722, 724 (8th Cir. 2005) (vacating under *Munsingwear* the district court's judgment in a habeas case where Court found case to be moot); *Camper*, 974 F.2d at 1031

(vacating under *Munsingwear* the district court's judgment in a habeas case where Court found case to be moot).

The public interest also weighs in favor of a vacatur. *See Panera*, 999 F.3d at 1158; *Moore*, 928 F.3d at 758. The "vagaries of circumstances" have now frustrated the Government's efforts to obtain appellate review of the district court's adverse ruling, and "fairness" counsels that the Government should not "be forced to acquiesce in [that] judgment." *Bancorp*, 513 U.S. at 25. Vacating the district court's order "enables the parties to litigate their issues on a clean slate" in other cases. *Panera*, 999 F.3d at 1158.

For these reasons, this Court should vacate the district court's order and remand the case to the district court with directions to dismiss the action as moot. *See Munsingwear*, 340 U.S. at 39-40; *Panera*, 999 F.3d at 1158-59; *Ali*, 419 F.3d at 724; *Camper*, 974 F.2d at 1031. In the alternative, if the Court disagrees with Appellants' mootness argument and denies this motion, Appellants respectfully request 30 days from the date of the entry of the Court's order to file the opening brief.

13

## CONCLUSION

For the foregoing reasons, the Court should grant Appellants' motion, vacate the district court's decision, and remand the case directing the district court to dismiss the case. In the alternative, the Court should grant Appellants 30 days to file the opening brief if it denies this motion.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General
Office of Immigration Litigation

MELISSA NEIMAN-KELTING
Assistant Director

/s/ Craig A. Newell, Jr.
CRAIG A. NEWELL, JR.
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
(202) 514-0298
Craig.Newell@usdoj.gov

ZACHARY A. CARDIN
Trial Attorney

Date: December 8, 2025

Attorneys for Appellants

14

# EXHIBIT A

782 F.Supp.3d 691
United States District Court, D. Minnesota.

ADITYA W. H., Petitioner

v.

Donald J. TRUMP, in his official capacity as President
of the United States; Pamela Bondi, in her official
capacity as United States; Daniel Hartog, in his official
capacity as the Kandiyohi County Sheriff; Matthew
Akerson, in his official capacity as Kandiyohi County
Jail Administrator; Peter Berg, in his official capacity as
the St. Paul Field Office Director for U.S. Immigration
and Customs Enforcement; Jamie Holt, in her official
capacity as Homeland Security Investigations St.
Paul Special Agent in Charge, U.S. Immigration and
Customs Enforcement; Todd Lyons, in his official
capacity as Acting Director, U.S. Immigration and
Customs Enforcement; Kristi Noem, in her official
capacity as Secretary of the United States Department
of Homeland Security; and Marco Rubio, in his
official capacity as Secretary of State, Respondents.

No. 25-cv-1976 (KMM/JFD)
|
Signed May 14, 2025

**Synopsis**

**Background:** Noncitizen, a national of Indonesia who had
been working at a hospital pursuant to a student visa and
who had a pending application for permanent-resident status
based on his marriage to a United States citizen with whom
he had a child, brought petition for habeas corpus against
President, various federal officials, county sheriff, and county
jail administrator, seeking release on bail and alleging that
his detention in Immigration and Customs Enforcement (ICE)
custody in county jail violated the First Amendment's Free
Speech Clause, the Fifth Amendment's Due Process Clause,
and the Administrative Procedure Act (APA) because he
was being unlawfully detained in retaliation for having
made statements supporting Palestine and the Black Lives
Matter (BLM) movement and for having participated in
peaceful protests against police brutality. Noncitizen moved
for a temporary restraining order (TRO) and a preliminary
injunction, but after the District Court, Katherine M.
Menendez, J., entered a TRO barring noncitizen's transfer,
the government agreed not to transfer him, and the parties

agreed that the court could proceed directly to considering the
petition's merits.

**Holdings:** The District Court, Katherine M. Menendez, J.,
held that:

none of the jurisdiction-stripping provisions of the Illegal
Immigration Reform and Immigrant Responsibility Act
(IIRIRA) or the Immigration and Nationality Act (INA)
deprived court of jurisdiction;

noncitizen had engaged in protected speech on matters of
public concern before being taken into custody, and he
thus established the first element of his First Amendment
retaliation claim;

noncitizen's detention both prevented him from speaking and
would have had a chilling effect on an ordinary person's
speech, and noncitizen thus established the second element of
his First Amendment retaliation claim; and

noncitizen showed that he was being detained because of his
protected speech, and he thus established the third element of
his First Amendment retaliation claim.

Petition granted in part; petitioner's motion for TRO and
preliminary injunction denied as moot.

**Procedural Posture(s):** Petition for Writ of Habeas Corpus.

**Attorneys and Law Firms**

Kshithij Shrinath, Greene Espel PLLP, Minneapolis, MN, for
Petitioner.

ORDER

Katherine Menendez, United States District Judge

**\*695** Petitioner Aditya W. H. (hereafter "Petitioner" or "Mr.
H") brought this action seeking a writ of habeas corpus
pursuant to 28 U.S.C. § 2241. Pet., ECF No. 1. In his
Petition, Mr. H requests an Order enjoining Respondents from
transferring Mr. H outside the jurisdiction of this District
while these proceedings are pending; directing Respondents
to immediately release Mr. H from immigration custody;
awarding Mr. H his reasonable attorney's fees; and any

other appropriate relief. Pet., Prayer for Relief ¶¶ 1–5. For the reasons that follow, the Petition is granted in part and Respondents are ordered to immediately release Mr. H on appropriate conditions.

## BACKGROUND

### Petitioner's Background

Mr. H is a 34-year-old Muslim student from Indonesia. He is an artist and a musician and has been a vocal advocate for social justice. Pet'r's Decl. ¶¶ 14–23, ECF No. 5; *id.*, Exs. 1–2; Pet. ¶ 1; *see also* Robinson Decl. ¶ 4, ECF No. 16. Mr. H entered the United States in January 2015 on an F-1 student visa and attended Southwest Minnesota State University in Marshall, Minnesota. Pet'r's Decl. ¶ 6; Robinson Decl. ¶ 4; Gad Decl., Ex. 3 at 3, ECF No. 7. He received his Bachelor of Science degree in Environmental Science from SMSU in 2017. Pet'r's Decl. ¶ 6. After graduation he was authorized to work in the United States through a program called Optional Practical Training ("OPT"). Pet'r's Decl. ¶ 7. In August 2021, Mr. H reapplied for an F-1 student visa to pursue a Master of Business Administration degree with a concentration in Supply Chain Management. That application was approved, and he had valid F-1 visa status that was set to last through June 2026. Pet'r's Decl. ¶ 8; Gad Decl., Ex. 6 at 3, 7.

Mr. H completed his MBA in December 2023 and began working at a hospital, the Avera Regional Medical Center, through a Curricular Practical Training program under his F-1 status. In that role, he eventually transitioned to OPT pursuant to his F-1 visa. Pet'r's Decl. ¶9; Gad Decl., Ex. 6 at 36, ECF No. 7. Those who know Mr. H through school and work admire his contributions **\*696** to his community in Marshall. Gad Decl., Ex. 6 at 62–66. Mr. H has a pending application for permanent resident status based on his October 2023 marriage to Mrs. H, a United States citizen. *See* Gad Decl. ¶ 5 & Ex. 1 (Notice of Receipt of Form I-485 Application); *id.*, Ex. 6 at 7 (Marriage Certificate); Pet'r's Decl. ¶¶ 12–13. The couple has a nine-month-old daughter with special needs. Pet'r's Decl. ¶ 40; Gad Decl., Ex. 6 at 11.

Mr. H does not have any significant criminal history. He has a small number of driving-related citations. In 2021, Mr. H was arrested during a peaceful protest following the police killings of George Floyd and Daunte Wright. That arrest resulted in a charge for presence at an unlawful assembly that was formally dismissed "in the interests of justice." Mr. H also has a conviction for a non-violent misdemeanor property-damage offense from 2022. Mr. H spray-painted graffiti art on the side of semi-trailers, and based on the asserted dollar value of the damage to those trailers, he was initially charged with first-degree property damage, a felony. Mr. H was not convicted of a felony, however. He entered a guilty plea to a fourth-degree misdemeanor charge, received a stayed sentence, completed a year of probation without incident, and has had no subsequent contact with the criminal justice system. *See* Pet'r's Decl. ¶¶ 15, 31; Gad Decl. ¶ 6, Ex. 3 at 4, Ex. 4 at 6–8; Pet. ¶ 59; Robinson Decl. ¶¶ 5–6. While the protest-related charge remained pending, the government approved Mr. H's application for his second F-1 visa to pursue his MBA. Pet'r's Decl. ¶¶ 8, 15.

Petitioner traveled to Indonesia in the spring of 2024, and he returned to the United States at the Los Angeles International Airport on April 27, 2024. Pet'r's Decl. ¶ 30; Gad Decl., Ex. 6 at 8. This was his most recent reentry into the United States. Robinson Decl. ¶ 4. At that time, Customs and Border Protection officials conducted security inspections and lawfully readmitted Mr. H to the United States. Pet'r's Decl. ¶ 30; Gad Decl., Ex. 5 at 7–8 (records of departure and arrival). That admission into the U.S. post-dated Mr. H's misdemeanor conviction, and Respondents were fully aware of Mr. H's criminal history at the time they readmitted him. *See* Pet. ¶¶ 60, 75, 81; Pet'r's Decl. ¶ 34.

During his time in the United States, Mr. H has been a vocal advocate for causes in which he believes and has created a company focused on selling environmentally friendly merchandise and sustainable products. Pet'r's Decl. ¶¶ 14–23. He explains: "[a]s a practicing Muslim, my faith teaches me to stand up for justice and the dignity of all people. Guided by those values, I actively participated in peaceful protests against police brutality, including in the wake of the tragic deaths of George Floyd and Daunte Wright in 2020 and 2021." Pet'r's Decl. ¶ 14. Mr. H sells products through a small clothing line called *Butter Soup & Frozen Custard.* Pet'r's Decl. ¶¶ 17–18. In the original Instagram account for his clothing line, he posted pictures that referenced political issues, including a Palestinian flag, and a mural that read "BLM" and "Free Palestine." Pet'r's Decl. ¶ 19; *id.*, Ex. 1. In the biography section of his new account for the clothing line, Mr. H includes the Arabic phrase "Free Palestine." Pet'r's Decl. ¶ 20. Mr. H states that he has donated to nonprofit organizations that provide humanitarian aid and conduct environmental restoration efforts. Pet'r's Decl. ¶ 21. He has "never supported any group or organization that engages in

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Appellate Case: 25-2413    Page: 17    Date Filed: 12/08/2025 Entry ID: 5585709

political violence or terrorism, including Hamas or any other group." Pet'r's Decl. ¶ 22.

### Respondents' Alleged Policies

The Petition asserts that Respondents "developed and implemented a policy using **\*697** the immigration system to retaliate against international students' protected speech and association." Pet. at 12 (Heading, § I.A.). Specifically, the Petition refers to Executive Order 14161 and Executive Order 14188, which were issued by Respondent, President Donald J. Trump, following his inauguration in January 2025. Executive Order 14161 provides that "the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security." Exec. Order No. 14161, 90 Fed. Reg. 8451, § 1(b) (Jan. 30, 2025); see also Pet. ¶ 30. Executive Order 14188 instructs the Secretary of State, Secretary of the Department of Education, and the Secretary of DHS to ensure that "institutions of higher education [are familiar] with the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3) so that such institutions may monitor and report activities by alien students and staff relevant to those grounds ...." Exec. Order 14188, 90 Fed. Reg. 8847, 8848 § 3(e) (Jan. 29, 2025); Pet. ¶ 31. It also instructs those officials to ensure that reports regarding those noncitizens "lead, ... if warranted, [to] actions to remove such aliens." 90 Fed. Reg. at 8848 § 3(e).

Following these Executive Orders, the Petition alleges that "Respondents began implementing the broad and vague 'Foreign Policy Ground' for deportability, codified at 8 U.S.C. § 1227(a)(4)(C)(i)" which allows the Secretary of State to revoke visas when "an individual's 'presence or activities' in the United States are deemed to have 'potentially serious adverse foreign policy consequences.' " Pet. ¶ 32. Petitioner alleges that Respondents have applied the Foreign Policy Ground to punish constitutionally protected speech of international students in the United States and have revoked the visas of students engaged in political expression, particularly those advocating for Palestinian rights or supporting racial justice. Pet. ¶¶ 38–39. Further, Petitioner alleges that ICE and DHS have "used social media surveillance to target international students for deportation" by using "artificial intelligence and data analytics to target international students *both* for protected pro-Palestinian speech *and* for any kind of contact with the criminal justice system." Pet. ¶ 42.

These allegations are consistent with an April 2025 DHS memo announcing that it is screening social media activity for immigration purposes pursuant to Executive Orders 14161 and 14188. [1] Since 2019, the State Department has required visa applicants to register identifying information for their social media accounts on an array of platforms. Pet'r's Reply at 12–13 & nn.10–11, ECF No. 18. In addition, media reporting reveals that the State Department has engaged in "social media vetting" for F-1 visa applicants. *Id.* at 13 n.13 (citing Ken Klippenstein, *Trump Admin Spies on Social Media of Student Visa Holders*, Substack (Mar. 28, 2025), https://www.kenklippenstein.com/p/exclusive-trump-admin-spies-on-social (citing 25 State 26168), *Action Request: Enhanced Screening and Social Media Vetting for Visa Applicants*). Mr. H asserts that these actions violate the targeted students' First Amendment rights to freedom of speech and Fifth Amendment due process rights.

In the weeks leading up to the filing of this Petition, Petitioner alleges that "DHS **\*698** has notified hundreds, if not thousands, of international students that they have 'lost status' due to visa revocations or [Student and Exchange Visitor Information System ("SEVIS")] record terminations." Pet. ¶ 48. "As of April 28, 2025, over 240 colleges and universities have reported more than 1,800 international students and recent graduates who have been similarly affected." Pet. ¶ 48. Petitioner asserts that the visa revocations implemented by Respondents fail to conform to requirements imposed by federal statutes and regulations governing visa revocations and termination of SEVIS records. Pet. ¶¶ 49–51.

### Petitioner's Arrest and Detention

According to John Armstrong, an official within the State Department's Bureau of Consular Affairs, on Saturday, March 22, 2025, U.S. Department of Homeland Security U.S. Immigration and Customs Enforcement ("DHS" "ICE") contacted the Department of State seeking its determination as to whether Mr. H's F-1 student visa should be revoked, with immediate effect, under Section 221(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1201(i). Armstrong Decl. ¶ 4, ECF No. 17. Respondents have not provided the underlying March 22nd communication from DHS to the State Department in response to Mr. H's habeas petition. Nor have the Respondents offered any evidence about why they selected Mr. H for this action. On March 23, 2025, Armstrong sent a State Department memo to Andre Watson (ICE Assistant Director, National Security Division), stating

that the Bureau of Consular Affairs revoked Mr. H's F-1 visa under Section 221(i) "based on the underlying information and assessment provided by DHS ICE that [Mr. H] posed a threat to U.S. public safety." Armstrong Decl. ¶ 5; Gad Decl., Ex. 4 at 4 (3/23/25 DOS Mem.). The State Department informed ICE that Mr. H's visa was revoked "effective immediately." Armstrong Decl. ¶ 5; Gad Decl., Ex. 3 at 3. The March 23rd State Department memo also indicates that DHS/ICE informed the State Department, prior to the revocation of Mr. H's visa, that it "intends to immediately pursue removal of [Mr. H.]" 3/23/25 DOS Mem. Mr. Armstrong states that the revocation of Mr. H's visa "predated the filing of this lawsuit" but the State Department did not immediately notify Petitioner of the revocation "[a]t the request of interagency partners, and for operational security reasons...." Armstrong Decl. ¶ 7. The March 23rd State Department memo characterizes the revocation of Petitioner's visa as "silent." Gad Decl., Ex. 3 at 3. Based on that "silence," Mr. H was not given immediate notice of the purported revocation of his student visa.

According to Mr. H's "A-File," [2] on March 24, 2025, following the revocation of his visa, Homeland Security Investigations ("HSI"), an arm of ICE, "received an investigative lead as part of the Student Criminal Alien Initiative relating to [Mr. H]." Gad Decl., Ex. 3 at 3. The available information indicates that the "Student Criminal Alien Initiative" is a DHS effort

> to run the names of the nearly 1.3 million nonimmigrant students studying in the United States through the National Crime Information Center (NCIC) database. ... As part of this initiative ..., DHS staff complied lists of students **\*699** with arrest or other criminal records and sent batches of that information to the State Department, which resulted in visa revocations for over 3,000 students. ... DHS terminated SEVIS records for those students.

*Vyas v. Noem*, No. 3:25-cv-00261, Doc. 30 at 7 (S.D. W. Va. May 8, 2025) (taking judicial notice); *see also* Second Gad Decl., Ex. 19, *Patel v. Lyons*, No. 1:25-cv-01096-ACR, Doc.

20-2 (D.D.C. May 2, 2025) (Hr'g Tr.), ECF No. 19. Andre Watson, the Senior Official within the National Security Division for HSI stated that HSI's Counter Threat Lead Development Unit is responsible for "analyzing information related to alien nonimmigrant visa holders, who are lawfully admitted to the United States but violate the terms of their admission, pose a threat to national security or public safety and/or are involved in criminal activity for field referral and further investigation." Robinson Decl., Ex. 4 at 39–44, Watson Decl. ¶¶ 1, 5. In another case, Watson described how other students' information was run against criminal databases and connected to law enforcement records shortly before their SEVIS records were terminated. Watson Decl. ¶¶ 6–9, 11–12, 14–16, 18–20.

On March 27, 2025, Mr. H was arrested by plainclothes ICE agents while he was at his job at Avera Marshall hospital. Pet'r's Decl. ¶ 24; *see also* Gad Decl. ¶ 7. The ICE agents instructed Mr. H's coworkers to stage a meeting with him in the basement of the hospital and told them that failing to cooperate would have legal consequences. Pet. ¶¶ 67–68. When the coworkers complied and Mr. H went to the basement for the purported meeting, ICE agents seized him, placed him in handcuffs, and transported him in an unmarked vehicle to Kandiyohi County Jail. Pet'r's Decl. ¶ 24. The ICE agents did not provide Mr. H with a warrant for his arrest, and Mr. H has not been charged with a crime. Pet'r's Decl. ¶ 25. On March 27th, HSI issued an administrative arrest warrant, which indicates that it was served on Mr. H on March 28th, the day after his arrest. Robinson Decl. ¶ 8, Ex. 1. [3] Mr. H was also not informed of the reason he was being arrested. Instead, ICE agents told him that "they will explain all that to you tomorrow" without clarifying who "they" were. Pet'r's Decl. ¶ 25.

William J. Robinson, an ICE Deportation Officer, states that "[a]t the time of [Mr. H's] arrest, the ICE officials who executed the warrant, arrested [Mr. H], and brough [sic] the charges were not aware of any statements or pronouncements made by [Mr. H] on social media through his personal accounts or his business accounts," Robinson Decl. ¶ 10, but none of these officials who were involved in the arrest is identified by name or job title. [4] Mr. Robinson does not state how DHS or ICE originally became aware of Mr. H's criminal history. Critically, missing **\*700** from Mr. Robinson's declaration is any attestation about what was known to the officials actually responsible for ordering Petitioner's arrest regarding Mr. H's speech on matters of public concern.

On March 28, 2025, ICE transferred Mr. H to the Fort Snelling ICE Field Office where he informed ICE officials that he had a valid F-1 status, was lawfully working under OPT, and had a pending I-485 application for adjustment of status based on his marriage. Pet'r's Decl. ¶ 28; Robinson Decl. ¶ 9. ICE officers told Mr. H that they could not verify what he was telling them because the SEVIS database was "down." Pet'r's Decl. ¶ 28. ICE agents served Mr. H with a Notice to Appear ("NTA") alleging that he was removable because he was admitted to the United States at an unknown place in April 2024 and remained in the United States after the March 23, 2025 revocation date of his F-1 visa. Pet'r's Decl. ¶ 29; Gad Decl. ¶ 8; Robinson Decl. ¶ 9. The NTA asserts that DHS charged Mr. H with being subject to removal under Section 237(a)(1)(B) of the INA, 8 U.S.C. § 1227(a)(1)(B), [5] for remaining in the U.S. after visa revocation. Gad Decl., Ex. 2.

The SEVIS website indicates that Mr. H's record was "terminated" and lists a "status change date" of March 29, 2025. Robinson Decl., Ex. 4 at 27. On March 29th, the site indicated that "Student is terminated pursuant to 237(a)(1)(C)(i) and 237(a)(4)(C)." Gad Decl., Ex. 5 at 7. As noted, INA 237(a)(4)(C) is the Foreign Policy Ground under which the Secretary of State may revoke visas when an individual's presence or activities in the United States are deemed to have potentially serious adverse foreign policy consequences. Despite this assertion, the Respondents now claim that "[t]he Secretary of State did not make any determination under Section 237(a)(4)(C) of the INA with respect to [Mr. H]." Armstrong Decl. ¶ 5. Mr. H's SEVIS record shows a "Manual Data Change" on April 8, 2025 at 12:06 a.m. performed by "SEVIS Maintenance." Gad Decl., Ex. 5 at 7. The SEVIS record shows that Petitioner was "identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." Gad Decl. Ex. 5 at 2. Respondents represent that the reference to the Foreign Policy Ground was removed as a "correction" to the SEVIS record to reflect that visa-revocation was the reason for the SEVIS termination. Resp't's Resp. 10, ECF No. 15.

On April 7, 2025, ICE provided three documents to Mr. H that it asserted supported his removal from the United States: (1) a memorandum from the United States Department of State purporting to document a "silent revocation" of Mr. H's visa based on his two-year-old misdemeanor conviction; (2) a dismissal order regarding his 2021 protest arrest, which showed that the charges had been dismissed "in the interests

of justice"; and (3) a copy of his plea petition in the misdemeanor graffiti case. Pet'r's Decl. ¶ 31; Gad Decl., Ex. 4. On April 10, 2025, Mr. H appeared for a bond hearing before an immigration judge ("IJ"). Pet'r's Decl. ¶ 36. His counsel presented evidence at the hearing showing Mr. H's full compliance with probation, stable family and community ties, and eligibility **\*701** for permanent residency based on his marriage to Mrs. H. Pet'r's Decl. ¶ 36; Gad Decl. ¶ 9. At the hearing, DHS presented the same evidence referenced above and the previously served NTA. Gad Decl. ¶ 10. The IJ found that Mr. H posed neither a danger nor a flight risk, and set a $5,000 bond. Pet'r's Decl. ¶ 37; Gad Decl. ¶ 11; Gad Decl., Ex. 7, IJ Bond Decision at 3–4.

However, DHS did not release Mr. H at that time. Instead, DHS appealed the decision to the Board of Immigration Appeals and invoked an immigration regulation (8 C.F.R. § 1003.19(i)(2)) to block Mr. H's release from an automatic stay. Pet'r's Decl. ¶ 37; Gad Decl. ¶ 12; Gad Decl., Ex. 8. According to Kerry Doyle, an experienced immigration attorney, the automatic stay provision is rarely invoked and only in extraordinary circumstances. Doyle Decl. ¶¶ 7, 12–13, ECF No. 6. Subsequent efforts by Mr. H's immigration counsel have been unsuccessful in obtaining his release from DHS custody. Gad Decl. ¶¶ 13–17 & Exs. 5, 9, 10, 14, 15.

Petitioner alleges that Respondents have no lawful basis under the immigration laws to detain him or to seek to remove him from the United States, and asserts that Respondents have provided shifting and incoherent rationales for his detention. For example, although ICE agents told Mr. H on March 28, 2025 that he was detained because he had "no lawful status," SEVIS records confirmed that his F-1 status remained active and in good standing at that time. Pet. ¶ 71. Although the NTA charged him as removable for allegedly remaining in the United States after the expiration of his authorized stay, in fact, he was arrested *before* any revocation occurred, and cannot have been overstaying his visa at the time of his arrest. Pet. ¶ 72. In addition, although the NTA indicated that Mr. H allegedly "entered the U.S. at an 'unknown port of entry,'" in fact he lawfully entered through the Los Angeles International Airport, which they knew. Pet. ¶ 75. Further, in a memo seemingly dated March 23, 2025, which was never served on Mr. H until after his arrest, the State Department appears to inform DHS that Petitioner's F-1 visa was revoked due to his misdemeanor conviction. Pet. ¶ 76. But again, this purported revocation of Mr. H's visa status did not occur until after his March 27th arrest, and there is no legal basis for making revocations retroactive. Pet. ¶¶ 77–79. And the

Appellate Case: 25-2413     Page: 20     Date Filed: 12/08/2025 Entry ID: 5585709

indication in SEVIS that his visa had been revoked under the Foreign Policy Ground was later "corrected," but it existed in the system for more than a week. Petitioner also claims that the documents DHS provided on April 7th, three days before his hearing before the IJ to support its removal action, constitute post hoc, legally baseless, and constitutionally deficient rationales. Pet. ¶¶ 80–84.

### *Petitioner's Claims and Procedural History*

In his Petition, Mr. H asserts four claims. First, he alleges that he is being detained because he exercised his right to freedom of speech under the First Amendment. Pet. ¶¶ 113–18 (First Claim); *id.* ¶¶ 3, 32–33, 39; Pet'r's Decl. ¶¶ 14–23. Mr. H asserts that Respondents have arrested and detained him to send a message to international students in the United States that even if such persons comply with all legal requirements and maintain valid status, they are not safe from arrest if they express political views disfavored by the Executive Branch. Pet. ¶¶ 54, 113–18. Second, Petitioner claims that his detention violates his Fifth Amendment right to due process because it bears no reasonable relationship to any legitimate government purpose and is, therefore, punitive. Pet. ¶¶ 119–25 (Second Claim). Third, he claims **\*702** that Respondents violated the Administrative Procedure Act when they retroactively terminated his SEVIS record without statutory authority, any factual justification, or procedural compliance. Pet. ¶¶ 126–32 (Third Claim). And finally, because he claims he is detained without lawful authority, he seeks release on bail pending adjudication of his Petition. Pet. ¶¶ 133–37 (Fourth Claim).

Mr. H filed the Petition on May 2, 2025, along with a motion for a Temporary Restraining Order and an Emergency Preliminary Injunction. On May 5, 2025, the matter was assigned to this Court, and the Court issued an Order later that day temporarily enjoining Respondents from "moving the Petitioner out of the District of Minnesota until the Court has an opportunity to decide the pending TRO motion." Order at 2, ¶ 1 (May 5, 2025), ECF No. 11. [6] Noting that counsel for the Respondents had been made aware of the filings in this matter, the Court instructed "[c]ounsel for the parties ... to meet and confer immediately regarding ... [w]hether an interim agreement can be entered about any of the requested substantive relief" and "[a]n appropriate briefing and hearing schedule for resolution of the TRO Motion." *Id.* at 2, ¶ 2. Finally, the Court set a telephonic status conference for 2:30 p.m. on Tuesday, May 6, 2025, to discuss the parties' conversations. *Id.* at 2.

Prior to the status conference, counsel for Petitioner advised the Court that Respondents consented not to transfer Mr. H out of the District through May 29, 2025, the date of Mr. H's next hearing before an immigration judge in his ongoing removal proceedings. Robinson Decl. ¶ 17. Respondents also agreed to provide Mr. H and the Court advance notice prior to any transfer of Mr. H outside of the District, and the parties agreed to a briefing schedule addressed to the merits of the petition. The Court held the status conference with the parties on May 6th, as scheduled, and expressed appreciation for the swift conferring by the parties. During that call, the parties confirmed that a ruling was no longer required on the motion for a TRO and for preliminary injunctive relief, and the Court could proceed directly to considering the merits of the petition. The Court issued a briefing order based on the parties' agreement.

Neither side has requested an evidentiary hearing. However, the parties were free to submit any evidence they wished in support of their respective positions, and both the Petitioner and the Respondents did so. The Court considers the Petitioner's motion for preliminary injunctive relief to be moot and proceeds to the merits of the Petition at the request of the parties.

## DISCUSSION

### I. Habeas Corpus

A district court may grant a writ of habeas corpus to any person who demonstrates he is in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2241(c)(3). The right to challenge the legality of a person's confinement "through a petition for a writ of habeas corpus ... extends to those persons challenging the lawfulness of immigration-related detention." *Deng Chol A. v. Barr*, 455 F. Supp. 3d 896, 900–01 (D. Minn. 2020) (citing **\*703** *Preiser v. Rodriguez*, 411 U.S. 475, 485, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Zadvydas v. Davis*, 533 U.S. 678, 687, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001); and *Demore v. Kim*, 538 U.S. 510, 517, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003)).

"Petitioner 'bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, he must satisfy his burden of proof by a preponderance of the evidence.' " *Freeman v. Pullen*, 658 F. Supp. 3d 53, 58 (D. Conn. 2023) (quoting *McDonald v. Feeley*, 535 F. Supp. 3d 128, 135 (W.D.N.Y. 2021)); *Lallave v. Martinez*,

609 F. Supp. 3d 164, 171 (E.D.N.Y. 2022) (same) (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011)); *Bradin v. United States Probation and Pretrial Servs.*, No. 22-cv-3032-JWL, 2022 WL 1154622, at *3 (D. Kan. Apr. 19, 2022) (citing cases discussing burden of proof in a habeas case under § 2241).

## II. Analysis

### A. Jurisdiction

Respondents first argue that this Court lacks jurisdiction to decide Mr. H's habeas petition. Respondents rely upon four separate statutes to support this position. First, Respondents characterize the Petition as actually challenging the underlying decision to revoke Mr. H's visa and argue that 8 U.S.C. § 1201(i) bars judicial review of that discretionary decision by the Secretary of State. Second, they argue that the Petition in fact seeks district court review of the Secretary of DHS's decision to initiate removal proceedings against Mr. H, but judicial review is prohibited by 8 U.S.C. § 1252(g). Third, Respondents assert that the Court lacks the authority to review the DHS Secretary's discretionary decision to initially detain Mr. H because 8 U.S.C. § 1226(e) bars judicial review. Finally, Respondents contend that Petitioner's constitutional claims under the First and Fifth Amendments must be channeled to the appropriate circuit court of appeals pursuant to 8 U.S.C. § 1252(a)(5), (b)(9), and this Court lacks jurisdiction to decide them. The Court disagrees. Mr. H has filed a habeas petition seeking his release from custody, and the Court, at a minimum, has jurisdiction over that. *See Mohammed H. v. Trump*, No. 25-cv-1576 (JWB/DTS), 781 F.Supp.3d 886, 891-92 (D. Minn. May 5, 2025) (rejecting identical challenges to jurisdiction in a similar habeas case).

In 28 U.S.C. § 2241, Congress explicitly provided that district courts have the power to grant a writ of habeas corpus to a person who is in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2241(c)(3). And habeas corpus review has long played an important role in immigration cases. As the Supreme Court has said:

> Before and after the enactment in 1875 of the first statute regulating immigration, 18 Stat. 477, ... [federal habeas corpus] jurisdiction was regularly invoked on behalf of noncitizens, particularly in the immigration context.... In case after case, courts answered questions of law in habeas corpus proceedings brought by aliens challenging Executive interpretations of the immigration laws.

*INS v. St. Cyr*, 533 U.S. 289, 305–06, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *Id.* at 301, 121 S.Ct. 2271; *see also Boumediene v. Bush*, 553 U.S. 723, 742–43, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (discussing the history of the writ, explaining that the Framers' "inherent distrust" of undivided power led to the adoption of separation-of-powers principles that **\*704** serve "not only to make Government accountable but also to secure individual liberty," and because that structure, "like the substantive guarantees of the Fifth and Fourteenth Amendments ... protects persons as well as citizens, foreign nationals who have the privilege of litigating in our courts can seek to enforce separation-of-powers principles").

It is true, however, that Congress has the power to modify the right to seek the writ under certain circumstances. *See Ozturk v. Trump*, No. 2:25-cv-374, 779 F.Supp.3d 462, 482 (D. Vt. Apr. 18, 2025) ("Congress may modify or eliminate the right to seek the writ if Congress provides 'a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention.'") (quoting *Swain v. Pressley*, 430 U.S. 372, 381, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977)). Congress included certain "jurisdiction-stripping" provisions in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 204-208, 110 Stat. 3009, and the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 302. And the REAL ID act notes that the jurisdiction-stripping provisions of the IIRIRA apply to habeas petitions. Pub. L. 10-13, 119 Stat. 302. However, as explored below, these proscriptions do not eliminate habeas jurisdiction over all immigration-related detention claims, and they do not extend to the claims Mr. H asserts in this case. *See Ozturk v. Hyde*, No. 25-1019, 136 F.4th 382, 387-88 (2d Cir. May 7, 2025) (denying the government's motion to stay the district court's order that petitioner be transferred from Louisiana to Vermont and finding that the government failed to show it was likely "to prevail on its arguments that various jurisdiction-

stripping provisions of the [INA] ... deprive the district court of jurisdiction over Ozturk's challenge to her detention"). And the Court finds that the statutes relied upon by the Respondents do not undermine its jurisdiction over Mr. H's Petition.

First, Section 1252(g) provides the following:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, ... no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). But the Supreme Court has explained that this provision is narrow—it applies "only to three discrete actions that the [DHS Secretary] may take: her 'decision or action' to 'commence proceedings, *adjudicate* cases, or *execute* removal orders.' " *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) ("*AADC*"); *see also Jennings v. Rodriguez*, 583 U.S. 281, 294, 138 S.Ct. 830, 200 L.Ed.2d 122 (2018) (citing *AADC*, 525 U.S. at 482–83, 119 S.Ct. 936, and explaining that "we read the [arise from] language [in 8 U.S.C. § 1252(g)] to refer to just those three specific actions themselves"). Here, the Petition asserts no such challenge; instead, Mr. H claims that his detention violates the First and Fifth Amendments of the Constitution. Section 1252(g) cannot be read to deprive the Court of jurisdiction to consider a habeas petition raising such claims.

Section 1226(e) is similarly unavailing. That statute does not extend to the constitutional claims Mr. H asserts here because he does not challenge discretionary judgments of the responsible government **\*705** official. Section 1226(e) provides that the DHS Secretary's "discretionary judgment regarding" the application of § 1226's provisions, including those concerning detention of noncitizens during the pendency of removal proceedings and release on bond

(§ 1226(a), (b)), "shall not be subject to review." 8 U.S.C. § 1226(e). It states that "[n]o court may set aside any action or decision by the [DHS Secretary] under this section regarding the detention of any alien or the revocation or denial of bond or parole." 8 U.S.C. § 1226(e). However, "Section 1226(e) contains no explicit provision barring habeas review," *Demore v. Kim*, 538 U.S. 510, 517, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), and several courts, including the Supreme Court, have held or implied that it does not bar jurisdiction over habeas petitions, *Jennings*, 583 U.S. at 295–96, 138 S.Ct. 830 (discussing limits of prohibition on judicial review in § 1226(e) and reaching the merits of a habeas petition); *Mahdawi v. Trump*, No. 2:25-cv-389, 781 F.Supp.3d 214, 227 (D. Vt. Apr. 30, 2025) (explaining that section "1226(e) does not preclude review through habeas procedures of claims that administrative action violates the Constitution"); *Ozturk*, 779 F.Supp.3d at 482 ("§ 1226(e) does not operate as a categorical bar to habeas review of detention.").

Section 1201, the third statute invoked by the Respondents to contest jurisdiction, governs the issuance and revocation of immigrant and nonimmigrant visas. [7] Section 1201(i) states that the Secretary of State may revoke a visa after it has issued "in his discretion." 8 U.S.C. § 1201(i). Further, it provides that "[t]here shall be no means of judicial review (including review pursuant to section 2241 of title 28 or any other habeas corpus provision ...) of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title." 8 U.S.C. § 1201(i). Here, Mr. H does not challenge the discretionary revocation of his visa, but instead his unconstitutional detention.

Finally, neither 8 U.S.C. § 1252(a)(5) nor § 1252(b)(9) deprive the Court of jurisdiction in this matter. Admittedly, these statutes provide limits on the authority of district courts to review any final order of removal and funnel such challenges to the appropriate courts of appeals. But review of an order of removal is not the relief Mr. H seeks in his Petition. Again, the Supreme Court's decision in *Jennings* is instructive. 583 U.S. at 294–95, 138 S.Ct. 830 ("For present purposes, it is enough to note that respondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar."); *Ozturk*, 779 F.Supp.3d at 483–84 (finding

Appellate Case: 25-2413    Page: 23    Date Filed: 12/08/2025 Entry ID: 5585709

that neither of these provisions was applicable under similar circumstances). [8] In sum, the Court finds it has jurisdiction to consider Mr. H's **\*706** Petition to the extent he challenges his detention as unconstitutional. None of the arguments raised by Respondents, nor the statutes they rely upon, requires a different conclusion.

### B. First Amendment Retaliation

Petitioner asserts he is in custody in violation of the Constitution of the United States because Respondents have retaliated against him based on his protected speech protected by the First Amendment. Pet. ¶¶ 113–18. Under the First Amendment, "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. The greatest protection is reserved for speech on matters of public concern:

> Speech on matters of public concern is at the heart of the First Amendment's protection.... The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.... That is because speech concerning public affairs is more than self-expression; it is the essence of self-government.... Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.

Snyder v. Phelps, 562 U.S. 443, 451–52, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (cleaned up). Speech falls into this specially protected category "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]' " Id. at 453, 131 S.Ct. 1207 (quoting Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) and San Diego v. Roe, 543 U.S. 77, 83–84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004)) (internal citations omitted).

The First Amendment not only protects speech, but it forbids government action punishing such speech. "As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." Nieves v. Bartlett, 587 U.S. 391, 398, 139 S.Ct. 1715, 204 L.Ed.2d 1 (2019) (cleaned up). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." Id. **\*707** (quoting Hartman v. Moore, 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006)).

Critically, the First Amendment right to free speech protects citizens and noncitizens alike, and applies broadly to those in the United States. Bridges v. Wixon, 326 U.S. 135, 148, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) ("Freedom of speech and press is accorded aliens residing in this country."); Mohammed H., 781 F.Supp.3d at 893-94 (citing Bridges, 326 U.S. at 148, 65 S.Ct. 1443).

For Mr. H to show that Respondents retaliated against him in violation of his First Amendment rights, he must demonstrate that (1) he engaged in protected activity; (2) adverse action was taken against him that would chill a person of ordinary firmness; and (3) a causal connection between a retaliatory motive and the adverse action. See Watson v. Boyd, 119 F.4th 539, 550 (8th Cir. 2024); Nieters v. Holtan, 83 F.4th 1099, 1110 (8th Cir. 2023) (same); Quraishi v. St. Charles Cnty., Mo., 986 F.3d 831, 837 (8th Cir. 2021) (same).

### Protected Speech

Mr. H has demonstrated that he engaged in protected speech, both as part of his participation in protests against misuse of force by police and through his publication, on his personal and business social media accounts, of statements voicing opposition to violence in Palestine and support for the lives of Palestinians in the West Bank and Gaza. This constitutes speech on matters of public concern and therefore lies at the heart of First Amendment protection. Mohammed H., 781 F.Supp.3d at 893-94; Snyder, 562 U.S. at 451–53, 131 S.Ct. 1207 (discussing the broad scope of matters of public concern). Respondents do not dispute that Mr. H engaged in protected First Amendment activity. The first element of the test for retaliation is met.

### *Chilling Effect*

In addition, Respondents make no argument that subjecting a person to detention pending removal proceedings based on his political speech would not have a chilling effect on the exercise of protected First Amendment activity. The Court finds that it would. The threat of being detained in Kandiyohi County Jail (or some other detention facility to which Respondents may choose to relocate Mr. H based on their own unilateral determinations) not only prevents Mr. H from continuing to engage in protected First Amendment activity, but also would chill an ordinary person from sharing their views on the same subject matter. *Mohammed H.,* 781 F.Supp.3d at 893-94 (citing *Thurairajah v. City of Fort Smith, Ark.,* 925 F.3d 979, 985 (8th Cir. 2019)); *Hoyland v. McMenomy,* 869 F.3d 644, 657 (8th Cir. 2017) ("[T]here can be little doubt that 'being arrested for exercising the right to free speech would chill a person of ordinary firmness from exercising that right in the future.' ") (quoting *Clary v. City of Cape Girardeau,* 165 F. Supp. 3d 808, 826 (E.D. Mo. 2016)), *abrogated on other grounds by Nieves,* 587 U.S. 391, 139 S.Ct. 1715. Here, the detention of Mr. H and others for speech plainly sends a message to everyone, particularly noncitizens. Pet'r's Decl. ¶ 47 ("Had I known back in 2021 that my peaceful protest activities and social media posts would lead to my arrest in 2025, I would not have done this.... [T]he cost of being detained and separated from my wife and daughter is too high now."); Thompson Decl. ¶ 20, ECF No. 20. It seems likely that this message is part of the point. U.S. Dep't of State, *Secretary of State Marco Rubio Remarks to the Press* (Mar. 28, 2025) ("[I]f **\*708** they seek to self-deport they can do that, because that's what we've done. We're basically asking them to leave the country. *That's why they've been detained.* They can do so tomorrow. Buy an airplane ticket and leave."), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3. The second prong of the test is met.

### *Causal Connection*

The third prong of the test is the one most specifically disputed by the Respondents: whether there is a causal connection between Mr. H's speech and his detention. The Court finds that Mr. H has made the required showing. Several categories of evidence in the record support this conclusion.

First, the evidence and public record materials submitted in support of Mr. H's Petition, including credible news reporting, evince an Executive policy to target noncitizen students located in the United States based on the expression of viewpoints about matters of public concern disfavored by the government. Executive Order 14161 demonstrates the government's intent to focus on the vaguely defined category of noncitizens within the United States who purportedly bear "hostile attitudes" toward Americans or U.S. culture and institutions. It instructs the State Department and DHS to "vet[ ] and screen[ ] [such persons] to the maximum degree possible." 90 Fed. Reg. 8451. Executive Order 14188 similarly conscripts colleges and universities into monitoring and reporting on foreign students' activities so that the government can pursue them. 90 Fed. Reg. 8847. Statements by officials within the Executive Branch further illustrate the government's focus on foreign students' speech disfavored by the Executive Branch. Pet'r's Reply at 30–31 nn. 28–30.

Petitioner has also shown the government's retaliatory motivation through similar contemporaneous cases involving students that have been detained after engaging in speech like Mr. H's, supporting Palestinian human rights and deploring violence directed at Palestinians. Pet. ¶¶ 32, 24, 40. The evidence before the Court indicates that the State Department has, since at least 2019, been collecting and retaining information about foreign student visa holders' social media accounts. It also shows that Respondents have used electronic tools to comb social media accounts in an effort to implement Executive Orders 14161 and 14188.

Next, Petitioner shows that he has been treated differently than other foreign students with criminal records who did not engage in protected activity like he did and who were neither arrested nor detained. The record reflects that DHS created the Student Criminal Alien Initiative to run the names of 1.3 million student visa holders through NCIC and terminate the SEVIS records for thousands of individuals who had law enforcement contact in that database. However, for those who did not engage in protected speech, Mr. H has shown that the government's enforcement stopped short of arrest and detention. Doyle Decl. ¶¶ 9–11 (noting that despite the termination of several thousand international students' SEVIS records based on interactions with the criminal justice system, only a small handful of those students were arrested and detained by DHS); Pet'r's Mem. in Supp. of Mot. for Temp. Restraining Order at 29–30 (citing Watson Decl. ¶21; *Deore v. Noem,* No. 2:25-cv-11038, Doc. No. 14-3 (E.D. Mich. Apr. 14, 2025)); *Isserdasani v. Noem,* No. 25-cv-283-

WMC, 2025 WL 1118626, at *4 (W.D. Wis. Apr. 15, 2025), ECF No. 4. Respondents do not dispute that they have treated other foreign students studying in **\*709** the United States whose visas have been revoked differently from Mr. H and others who engaged in protected speech—namely, by detaining only the latter.

Moreover, based on the record here, the Court finds it is more reasonable to infer that Respondents have detained Mr. H in retaliation for his speech than because of any professed public safety concern. The evidence offered by Respondents to demonstrate a purportedly non-retaliatory motive is simply too vague and inconsistent to support the conclusion Respondents ask the Court to reach. For example, the March 23 rd State Department memo indicates that DHS/ICE initially reviewed Mr. H's eligibility for a visa, determined that he was ineligible, and then contacted the State Department seeking its agreement on that point. But Respondents have not produced the purported initial March 22 nd communication from DHS/ICE to the State Department, so it does nothing to dispel the indication that Petitioner was identified based on the government's targeting of protected speech. And the Respondents offer no direct evidence to deny or refute that the initial decision to contact the State Department and ultimately pursue Mr. H's detention was related to Mr. H's protected speech. The timing is even further clouded by the suggestion in a May 8, 2025 brief filed by DHS before the BIA that ICE received information about Petitioner's criminal history on March 24, 2025, Second Gad Decl., Ex. 17, which is after the State Department's purported revocation at the initiation of DHS. That same March 24 th date is reflected in Mr. H's A-file. Gad Decl. Ex. 3 at 3.

Further, according to the March 23 rd memo, DHS/ICE had apparently already determined that it would immediately pursue removal of Mr. H *before* the State Department responded and advised that Petitioner's visa had been swiftly revoked. This flatly undercuts Respondent's stated justification that Petitioner was detained for purposes of effectuating his removal simply because his visa was revoked by the State Department. And DHS/ICE had already purportedly determined that Mr. H posed a threat to public safety based on his misdemeanor graffiti conviction. This evidence is accompanied by no explanation of how ICE became aware of Mr. H's criminal history or why it sought out the State Department's intervention and revocation of Petitioner's visa, let alone what about that nearly two-year old non-violent misdemeanor illustrates a present threat to

public safety. *Mohammed H.*, 781 F.Supp.3d at 893 ("Rather than providing evidence of a lawful basis to act against Petitioner, the March 23 memo reinforces Petitioner's claim that DHS had already determined it would act to remove him, and the visa revocation came after as the purported legal justification."). [9]

It is also telling that Mr. H's property-damage misdemeanor presented no barrier to his entry to the United States upon his late-April 2024 return from a trip to see his family in Indonesia. Respondents have in no way rebutted Mr. H's evidence demonstrating that the government was fully aware of his two-year-old conviction when he reentered the country at LAX. That Petitioner's criminal history was the same upon that encounter with immigration authorities undermines the Respondents' suggestion that his criminal history, not his protected First Amendment speech motivated the detention decision in this case.

**\*710** The inference of retaliatory motive is further supported by DHS first citing and then abruptly disavowing the Foreign Policy Ground as the stated justification for termination of Mr. H's SEVIS record. The record shows that *after* Mr. H was arrested by ICE agents at his job on March 27, 2025, his SEVIS record was terminated based on the Foreign Policy Ground. Although Respondents argue that the Secretary of State never made a determination under INA § 237(a)(4)(C) and the SEVIS record was manually "corrected" to show that revocation of his visa was the basis for the SEVIS termination, they provide no evidence explaining how the Foreign Policy Ground appeared in the first instance if it was never part of the calculus.

The Court also observes the total lack of evidence offered by the Respondents that the actual decision-makers involved in Mr. H's initial apprehension, continued detention, and stay of the IJ's order for release on bond were either unaware of or not motivated by Mr. H's speech. This omission speaks volumes. Deportation Officer Robinson's declaration actually does nothing to refute the inference that the government's focus on disfavored student speech motivated ICE's pursuit and detention of Petitioner. Mr. Robinson declares only that the officers who executed the administrative warrant on March 27 th were unaware of Mr. H's protected speech on social media platforms at the time they took him into custody. Robinson Decl. ¶ 10. But that assertion says nothing about what was known to any other ICE representatives or other DHS personnel who directed the arresting agents to apprehend Petitioner. *Mohammed H.*, 781 F.Supp.3d

at 892-83 ("Critically, the Government has not supplied evidence of the reason why DHS/ICE contacted DOS about Petitioner on March 22, 2025."). For example, Respondents say nothing about whether the DHS/ICE officials who sent a communication to the State Department on March 22 knew of the posts on Mr. H's social media accounts when they requested revocation of his visa. Respondents also offer no direct evidence to refute Petitioner's claim that he and others are targeted for detention because of their speech: no declaration disavows the existence of such a policy.

Respondents assert that Mr. H's "claims fail as a matter of law because his removal proceedings and detention follow from the revocation of his visa by the Secretary of State based upon his criminal record." Doc. 15 at 16, 19. [10] The mere fact that Respondents can point to the existence of a misdemeanor conviction does not show that their detention of Mr. H is not motivated by his speech. In referencing his misdemeanor property-damage conviction, Respondents have pointed to a rationale that the Court will assume *could* provide a reason for detention unrelated to speech. But on this record, and with the showing made by Petitioner, it more likely indicates pretext, while the true reason for taking him into custody and detaining him during the ongoing removal proceedings is retaliation for his public expression of support for Palestinian human rights. Respondents have essentially labeled that viewpoint as disfavored speech through Executive Orders **\*711** and public expressions of the policy described in the Petition.

And to reiterate, the causal connection at issue here is the tether between Mr. H's exercise of his First Amendment rights and Respondents' continued detention of him. Beyond the evidentiary showing that Petitioner's speech motivated ICE's arrest and initial detention of him, the decision to continue to detain him is not divorced from his speech. As part of the ongoing removal proceedings, ICE has made repeated references to the arrest stemming from Mr. H's presence at a protest. Despite the fact that the prosecutor responsible for that case dismissed the unlawful-assembly charge against Mr. H in the interests of justice, ICE has invoked that case in support of its efforts to keep him detained, including at the bond hearing, Gad Decl., Ex. 4 at 6, and in its brief to the BIA after it applied the automatic stay to prevent Petitioner's release on bond as required by the IJ, Second Gad Decl., Ex. 17, DHS Bond Brief on Appeal at 4. This further implies that his detention is motivated by his support for a particular viewpoint. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.... Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."). And Respondents again offer no evidence that the invocation of an apparently rarely used stay provision to prevent his release by the IJ was not motivated by Mr. H's protected speech.

Respondents argue that Petitioner cannot demonstrate causation because he presents no comparator evidence and offers only supposition that he was targeted for his speech. Doc. 15 at 48–49 (citing *Nieves v. Bartlett*, 587 U.S. 391, 139 S.Ct. 1715, 204 L.Ed.2d 1 (2019) and *Gonzalez v. Trevino*, 602 U.S. 653, 144 S.Ct. 1663, 219 L.Ed.2d 332 (2024) (per curiam)). But as the Court discusses above, Mr. H has in fact provided comparator evidence indicating that other students whose SEVIS records were terminated, but who did not engage in protected speech, were not arrested or detained, and evidence that others who engaged in similar speech were arrested and detained. *Gonzalez*, 602 U.S. at 658, 144 S.Ct. 1663 (explaining that the plaintiff's burden does not require presentation of "virtually identical and identifiable comparators"). [11] This is classical comparator evidence.

**\*712** Finally, contrary to Respondents' position, the Court finds neither *Harisiades v. Shaughnessy*, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952), nor *Carlson v. Landon*, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952) to be "instructive" in this case. Doc. 15 at 18–19 (asserting that *Carlson* "is particularly instructive here"); *id.* at 49–50 (stating that *Harisiades* "is instructive"). DHS and ICE do not accuse Mr. H of advocating violence or associating with an organization actively seeking to overthrow the United States government. *See Mohammed H.*, 781 F.Supp.3d at 894 (distinguishing *Harisiades* because "Petitioner is not accused of subversive association or violent ideology. His speech—opposing violence in Palestine—falls within the core of protected expression, which extends to noncitizens").

Accordingly, the Court finds that Mr. H has shown that he is in custody in violation of the First Amendment and is entitled to a writ of habeas corpus for his immediate release. Because the Court concludes that Mr. H prevails on his First Amendment retaliation claim, it does not address his Fifth Amendment Due Process claim or his APA claim.

**III. Order**

As discussed above, **IT IS HEREBY ORDERED THAT:**

1. Petitioner's Motion for Ex Parte Temporary Restraining Order and Emergency Preliminary Injunction, ECF No. 2, are **DENIED as moot**.

2. The Petition, ECF No. 1, is **GRANTED in part**.

3. Petitioner shall be released from custody, immediately, subject to the conditions previously imposed by the Immigration Judge, including the $5,000 bond.

4. Within 48 hours of this Order, Respondents shall notify the Court of the date and time of Petitioner's release.

**Let Judgment be entered accordingly.**

**All Citations**

782 F.Supp.3d 691

---

## Footnotes

1    U.S. Citizenship and Immigration Servs., *DHS to Begin Screening Aliens' Social Media Activity for Antisemitism* (Apr. 9, 2025), https://www.uscis.gov/newsroom/news-releases/dhs-to-begin-screening-aliens-social-media-activity-for-antisemitism.

2    "A-Files are used to document aliens' interactions with USCIS, Customs and Border Protection, and Immigration and Customs Enforcement. They include all an individual's official immigration and naturalization records and are identified by a unique A-Number." U.S. Citizenship and Immigration Servs., *A-File #1 (Million): The first A-File* (updated Jan. 24, 2025), https://www.uscis.org/about-us/our-history/stories-from-the-archives/a-file-1-million-the-first-a-file.

3    As reflected on the face of the warrant for Mr. H's arrest, an ICE administrative warrant is different from a judicial arrest warrant. The latter requires an independent judicial officer to determine that there is probable cause to believe that the person to be arrested has committed a crime. In the immigration context, the administrative arrest warrant (Form I-200) is issued based on an immigration officer's own determination of probable cause that a noncitizen is removable from the United States. *See Abel v. United States,* 362 U.S. 217, 233, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) (discussing history and use of administrative warrants in the immigration context and implicitly finding the use of such administrative warrants constitutional).

4    Mr. Robinson provides no explanation regarding how he knows what the arresting officers knew, beyond the assertion that his declaration is based, in part, on "information conveyed to me by other law enforcement officials," Robinson Decl. ¶ 1.

5    INA § 237(a) provides for the removal of certain classes of noncitizens who have been admitted to the United States by immigration authorities. As relevant here, this includes any noncitizen "whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under [INA § 221(i), 8 U.S.C. § 1201(i).]" 8 U.S.C. § 1227(a)(1)(B). In turn, INA § 221(i) allows the Secretary of State to revoke a visa after it has been issued to a noncitizen and requires that notification of the revocation be provided to the Secretary of DHS. 8 U.S.C. § 1201(i).

6    The Court instructed Respondents that they could seek relief at any time from the Order precluding moving Mr. H out of the District by filing a motion. Although Respondents aver that the Court's Order on transfer

while the Petition is pending is unlawful, Resp't's Resp. 41–43, ECF No. 15, they have not filed a motion challenging that Order.

7    The INA distinguishes between "immigrant visas," 8 U.S.C. § 1101(a)(16), and "nonimmigrant visas," 8 U.S.C. § 1101(a)(26). Immigrant visas are issued to persons who wish to live permanently in the United States, and nonimmigrant visas are issued to those who are vising the U.S. on a temporary basis, including for study. U.S. Customs and Border Protection, *What is the difference between an Immigrant Visa vs. Nonimmigrant Visa?* (July 19, 2024), https://perma.cc/8DQY-A5CJ.

8    As stated by another Court facing similar claims to those raised by Mr. H:

> The Court offers one final observation about the government's argument that constitutional challenges to detention must be brought first to an Immigration Judge, then to the Board of Immigration Appeals, and finally via a petition for review to the court of appeals. There are serious questions about whether that process would be an adequate substitute for the writ of habeas corpus in district court, given the limited scope of administrative review....
>
> ....
>
> Consider that the government's argument on this issue boils down to a bold statement that no matter how egregious the type or quantity of First Amendment or due process violations committed by the government in detaining an individual, an Article III court *cannot* consider any alleged constitutional violations until the Article II employees, with no power to consider or address those violations, have moved the case through their lengthy process. Put another way, the government argues that § 1226(a) grants practically limitless, unreviewable power to detain individuals for weeks or months, even if the detention is patently unconstitutional. Fortunately, this Court need not rule on the merits of that argument today, given the Court's rejection of the jurisdictional bar on other grounds.

> *Ozturk*, 779 F.Supp.3d at 485-86.

9    The Court notes that the numerous similarities between Mr. H's case and that of *Mohammed H.* provide further support for a finding of retaliatory motive here.

10    Respondents also criticize Petitioner's citation to an April 9, 2025 press release from the United States Customs and Immigration Services regarding use of artificial intelligence tools to review social media posts because it post-dates Petitioner's visa revocation. But Petitioner has pointed to evidence that the State Department has gathered information about visa applicants' social media accounts since 2019. And Petitioner notes reports that the State Department had already admitted to using artificial intelligence and social media surveillance as early as March 6, 2025.

11    Both *Nieves* and *Gonzalez* address the causation rules applicable to claims for retaliatory arrest when a plaintiff brings suit against government officials under ⚑ 42 U.S.C. § 1983. *Nieves*, 587 U.S. at 399, 139 S.Ct. 1715 (discussing "causal complexities" in establishing retaliatory-arrest liability and concluding that the plaintiff bringing such a claim must show "the absence of probable cause for the arrest"). However, it is far from clear that the *Nieves* no-probable-cause standard must be applied in the habeas context rather than in the ⚑ § 1983 context, and Respondents do not point to cases applying it to habeas claims like Mr. H's. *See Welch v. Dempsey*, 51 F.4th 809, 812–13 (8th Cir. 2022) (declining to extend the *Nieves* rule beyond the Fourth Amendment context where courts ignore subjective intent of the officers in favor of a standard of objective reasonableness). This may be because in ⚑ § 1983 claims, the focus is necessarily on the actions of an individual state official, whereas in habeas cases, "the petition need not identify a particular violator,

only that his confinement is unconstitutional." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 700–01 (9th Cir. 2021) (discussing the reasons that *Nieves* was not applicable in a habeas case challenging the lawfulness of a bond-revocation decision in the immigration context).

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B



# U.S. Department of Justice

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*



*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**Gad, Sarah**
**Gad&  Gad Law Offices**
**916 North Emerson Avenue**
**Minneapolis  MN  55411**

**DHS/ICE OFFICE OF CHIEF COUNSEL – BLM**
**1 Federal Drive, Suite 1800**
**Ft. Snelling MN 55111**

**Name: HARSONO, ADITYA**          **A** ███████

**Date of this Notice:**    **8/6/2025**

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

John Seiler
Acting Chief Clerk

Enclosure

Userteam:  <u>Docket</u>



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

HARSONO, ADITYA

████████████████

DHS/ICE OFFICE OF CHIEF COUNSEL – BLM
1 Federal Drive, Suite 1800
Ft. Snelling MN 55111

Name: HARSONO, ADITYA

A ████████

Date of this Notice:    8/6/2025

Enclosed is a copy of the Board's decision in the above-referenced case. This copy is being provided to you as a courtesy. Your attorney or representative has been served with this decision pursuant to 8 C.F.R. § 1292.5(a). If the attached decision orders that you be removed from the United States or affirms an Immigration Judge's decision ordering that you be removed, any petition for review of the attached decision must be filed with and received by the appropriate court of appeals within 30 days of the date of the decision.

Sincerely,

John Seiler
Acting Chief Clerk

Enclosure

Userteam:  Docket

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

MATTER OF:

Aditya HARSONO, ███████████

Respondent

ON BEHALF OF RESPONDENT: Sarah Gad, Esquire

ON BEHALF OF DHS: Madeline Jack, Assistant Chief Counsel

IN BOND PROCEEDINGS
On Appeal from a Decision of the Immigration Court, Fort Snelling, MN

Before: Mann, Appellate Immigration Judge

MANN, Appellate Immigration Judge

The Department of Homeland Security ("DHS") appeals the Immigration Judge's April 10, 2025, decision granting the respondent's request for a custody redetermination and setting a bond in the amount of $5,000. The basis for the order is set forth in the Immigration Judge's April 21, 2025, bond memorandum. The respondent has filed a brief in opposition to DHS' appeal. The appeal will be dismissed.

The Board reviews an Immigration Judge's findings of fact under the clearly erroneous standard. 8 C.F.R § 1003.1(d)(3)(i). The Board reviews all other issues, including questions of judgment, discretion, and law, de novo. 8 C.F.R § 1003.1(d)(3)(ii).

On appeal, DHS does not challenge the Immigration Judge's findings that the respondent poses only a slight risk of flight and that a $5,000 bond will insure his appearance at future hearings. Instead, DHS disputes the Immigration Judge's threshold finding that the respondent has established that he does not pose a present danger to persons or property.

We will affirm the Immigration Judge's decision regarding the respondent's dangerousness. An Immigration Judge has "broad discretion" in making bond decisions and "may choose to give greater weight to one factor over others, as long as the decision is reasonable." *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006). In this case, the Immigration Judge considered the respondent's April 16, 2021, arrest in Lyon County, Minnesota, for "Riot," which resulted in a later charge for being present at an unlawful assembly that was ultimately dismissed "in the interest of justice." (IJ Bond Memorandum at 2; Exh. B at Tab B). The Immigration Judge also weighed the respondent's October 18, 2022, arrest in Lyon County, Minnesota for first-degree damage to property related to engagement in graffiti in July 2022, which resulted in (1) the respondent's February 2, 2023, guilty plea to fourth-degree damage to property; (2) a 90-day jail sentence that was stayed in favor of supervised probation for one year; (3) the respondent's successful

completion of that probation; and (4) the imposition of a $485 fine (IJ Bond Memorandum at 2; Exh. B at Tab C). After observing that the respondent's arrests had occurred several years ago and that he only had a single conviction, the Immigration Judge concluded that the respondent's course of conduct after July 2022 – including no additional arrests and his completion of probation – demonstrated that he has not continued in a course of criminal conduct and that, beyond that, he is not presently a danger to persons or property (IJ Bond Memorandum at 2-3).

We have carefully considered DHS' arguments on appeal regarding dangerousness to property, and we acknowledge that they reflect a reasonable view of the evidence (DHS Br. at 3-5). But we are unpersuaded that the Immigration Judge's factual findings on the dangerousness issue are clearly erroneous or that her decision is unreasonable. *Matter of Guerra*, 24 I&N Dec. at 40; *see also Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573-74 (1985) (holding that where there are two permissible views of the evidence, the fact finder's choice between them cannot be deemed clearly erroneous); *Matter of R-S-H-*, 23 I&N Dec. 629, 637 (BIA 2003) (stating that the Board may overturn an Immigration Judge's findings of fact only when it "is left with the definite and firm conviction that a mistake has been committed") (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)) (internal quotation marks omitted). We therefore affirm the Immigration Judge's decision.

Accordingly, the following order will be entered.

ORDER: The appeal is dismissed.

Appellate Case: 25-2413    Page: 35    Date Filed: 12/08/2025 Entry ID: 5585709

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Fed. R. App. P. 27(d), the foregoing motion is proportionally-spaced, has a Times-Roman typeface of 14-points, and contains 2,869 words.

 /s/ Craig A. Newell, Jr.
CRAIG A. NEWELL, JR.
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
(202) 514-0298
Date: December 8, 2025          Craig.Newell@usdoj.gov

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 8, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

    /s/ Craig A. Newell, Jr.
CRAIG A. NEWELL, JR.
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
(202) 514-0298
Craig.Newell@usdoj.gov